GREAT LAKES TOWING CO. v. SHENANGO S. S. & TRANSP. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. January 2, 1917.)

No. 2871.

1. Towage ⬅12(1)—Relation and Duties of Tow to Tug.
     It is the duty of a steamship in charge of tugs, but ready to assist them with her steam if called upon, to conform to and promptly obey the signals of the tugs.
     [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 24–26; Dec. Dig. ⬅12(1).]

2. Towage ⬅15(2)—Injury to Tow—Presumption of Negligence of Tugs.
     A collision between a steamship and a breakwater, while being maneuvered by tugs in a restricted harbor, raises against the tugs a presump-

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tion of negligence, and the burden of proof is upon them to show that they exercised due care.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 34–36; Dec. Dig. &#x229C;15(2).]

**3. TOWAGE &#x229C;11(7)—INJURY TO TOW—LIABILITY OF TUGS.**

Two tugs, engaged in turning a large steamship in a small harbor inclosed by breakwaters, both *held* in fault for a collision between the steamer and a breakwater for negligent handling of the vessel.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 19; Dec. Dig. &#x229C;11(7).]

**4. COLLISION &#x229C;95(2)—STEAMSHIPS MANEUVERING IN HARBOR—NEGLIGENT HANDLING BY TUGS.**

The steamship Shenango, 600 feet long, while being turned by two tugs in a small harbor inclosed by breakwaters, to pass from one pier to another, had her stern grounded on the broken stone at the foot of one of the breakwaters, and her bow was then pushed around by one of the tugs until it came into collision with the steamship Rensselaer, which had just entered the harbor and was proceeding to a pier on the other side. *Held*, that neither of the steamships was in fault; the Shenango being wholly in charge of the tugs, and the Rensselaer having sufficient room to pass safely to her pier if the tugs properly maneuvered the Shenango, on which she had a right to rely, but that both tugs were in fault for the collision for negligent handling of their tow.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. &#x229C;95(2).]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; John H. Clarke, Judge.

Suit in admiralty for collision by the Shenango Steamship & Transportation Company, owner of the steamer Shenango, against the Great Lakes Towing Company, owner of the tugs Reidenbach and Sunol, and the Pittsburgh Steamship Company, owner of the steamer Rensselaer. Petition of the Pittsburgh Steamship Company against the Great Lakes Towing Company, and cross-libel of the Pittsburgh Steamship Company against the Shenango Steamship & Transportation Company. Decree in favor of both steamship companies against the towing company, and that company appeals. Affirmed.

H. D. Goulder and T. H. Garry, both of Cleveland, Ohio, for appellant.

O. D. Duncan, of New York City, and G. B. Marty, of Cleveland, Ohio, for appellee Shenango S. S. & Transp. Co.

H. A. Kelley, of Cleveland, Ohio, for appellee Pittsburgh S. S. Co.

Before WARRINGTON and KNAPPEN, Circuit Judges, and HOLLISTER, District Judge.

HOLLISTER, District Judge. The ultimate question involved is upon whom the responsibility rests for injuries to the steamers Shenango and Rensselaer, growing out of collisions in the harbor at Ashtabula, Ohio, resulting from maneuvers in which these vessels and the tugs Reidenbach and Sunol were engaged at about 9:30 p. m., July 25, 1910.

---

&#x229C;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The harbor at Ashtabula is of artificial construction, and, because of its breakwaters and the projection of docks into the harbor, affords a restricted area within which large vessels may maneuver. The inserted diagram, following the government chart, with some additions, shows the important physical features referred to in the discussion.

The Shenango, 607 feet over all, 58 feet beam, in water ballast, drawing 7 feet forward and 16 feet 8 inches aft, lay with her bow up the Ashtabula River, at dock No. 10. Below her at the same dock lay the Stanton, 530 to 540 feet long, projecting slightly beyond the northern end of the dock. Both vessels carried adequate electric lights. The night was clear, though dark, and there was little or no wind.

The Rensselaer, 476 feet long, 50 feet beam, and heavily laden with iron ore to a draft of 19 feet, was slowly approaching the harbor from

the lake, with the purpose of proceeding to the slip of the Lake Shore & Michigan Southern Railway.

The Shenango, wishing to go to dock No. 11, whistled for tugs. The Sunol and Reidenbach responded. The former tied to her stern, and the latter to her bow, with a line, 50 to 60 feet long. The Shenango, with steam up, placed herself in charge of the tugs and did not at any time use her steam, except to assist in clearing the Stanton, and for signaling, and in one other operation to be described. She was strictly in tow. To accomplish the purpose of the contemplated movement, it was necessary for the Shenango to be backed sufficiently into the harbor so that in the winding process she would clear the shallow water northward of the stone ridge; care being taken that her bow should be free of the northwest corner of the dock at the east of the river.

With the exercise of proper care, though the limits of operation were narrow, there is no reason why the Shenango could not have been winded while the Rensselaer was entering into the harbor and proceeding to her slip. In such a harbor vessels maneuver at close quarters, even to the extent sometimes of rubbing against each other. The Shenango and the Rensselaer knew the harbor, and the tugs were intimately acquainted with it.

From the greatly conflicting testimony taken more than four years after the occurrence, it may fairly be gathered that, at or about the time of beginning the winding process, the Sunol blew an alarm blast of three whistles, followed by a similar and louder blast from the larger whistle of the Shenango. The tugs and the Shenango knew the Rensselaer was near the entrance of the harbor. Whether at first the Rensselaer distinguished the lights on the Shenango from the many lights at the dock as she looked in from the entrance is immaterial, for she knew from the signals that a movement of a vessel in the harbor was contemplated, though she may not, at first, have known its purpose. There was no other vessel than the Shenango and the tugs moving in the harbor, and the Rensselaer knew that the movement in progress meant that either a vessel was operating in the harbor or was coming out of it. If it were the latter, there was plenty of room for passing within the 400 feet between the two piers at the harbor mouth; so that there was no reason why she should not proceed into the entrance, slowing down so far as to only maintain her headway. This she did. She then knew, from the stern lights of the Shenango and the lights on the tugs, that a winding process was in progress westwardly, in which case she knew there was sufficient room for her to proceed along the easterly breakwater to her destination, if the winding process was properly carried out.

Events followed in rapid sequence. The entire time between the beginning of the Shenango's movement and the collision between her and the Rensselaer was probably less than 10 minutes. Distances were short, and the ships were long.

The Shenango proceeded into the harbor, pulled stern foremost by the Sunol; the Reidenbach with taut tow line guiding the bow out of the river, now on one side and now on the other. At or about

the time the Shenango's bow had cleared the corner of the dock to the east, the Reidenbach, with her stem against the side of the Shenango and at a distance of the length of her tow line from the Shenango's starboard bow, pushed with all her power. She was a powerful boat. Meanwhile the Rensselaer was proceeding into the harbor at about right angles to its entrance, and at about midway, or a little east of midway, of the piers.

The Sunol was pulling the stern of the Shenango around southwardly. This movement, with the strong pushing force of the Reidenbach, drove the Shenango's bow of light draft rapidly to port, perhaps as much as three miles an hour. The captain of the Sunol, appreciating for the first time how closely the maneuver as carried out by him and the Reidenbach was bringing the stern of the Shenango to the westerly breakwater, signaled to the Shenango to go ahead at full speed. She responded quickly and put on full power, but it was too late to prevent the grounding of her stern upon the submerged broken stone of the breakwater at a point from 25 to 50 feet from the breakwater itself. There her propeller and adjacent underparts were seriously damaged and the engines were stopped.

Whether or not a forward movement was given the Shenango, by thus putting on full steam for the purpose, may not be known certainly from the testimony; but there is strong evidence tending to show that, after striking, she slid off the bottom, and there is every probability that the effect of her action was a forward movement, though not of many feet. Whatever the distance was, the movement took place at a critical time, especially when the point at which the vessel struck the breakwater and the pushing of the Reidenbach are considered. From all the testimony, that point must be fixed nearer to 600 feet from the end of the west pier than 800 feet, and it probably was not much more than 600 feet. Meanwhile the Reidenbach was pushing against the Shenango's bow as hard as she could.

The Rensselaer, after clearing the east pier, putting her helm hardastarboard, proceeded to port at full speed, a proper maneuver, which necessarily caused her stern to swing southwardly while her bow bore eastwardly of the knuckle at the north end of the easterly dock, and the light on the west pier showed over her stern. The swinging bow of the Shenango came into collision with the starboard side of the Rensselaer at about midships, and the vessels scraped along each other until clear; each being injured.

These facts are in substantial compliance with the findings of Judge (now Mr. Justice) Clarke, with whom we are in full accord, and there is no occasion for applying the rule which authorizes the adoption of facts found by the trial court when the testimony is conflicting, unless the finding is clearly against the weight of the evidence.

When the Shenango grounded on the ripraps of the breakwater, she lay about east and west. Her bow continued to swing northwardly, and, at the time of colliding with the Rensselaer, must have been certainly as far east as the line projected northwardly from the northwesterly corner of the easterly dock. It is probable that her bow was even further east than that, and at or near the point marked "A"

on the chart, something over 500 feet south of the entrance, and something less than 800 feet north of the corner of the easterly dock. The weight of evidence puts her bow there, and in a position to inevitably bring about a collision with the Rensselaer.

In the court below there was apparently no serious claim made by either the Rensselaer or the owner of the tugs that the Shenango was blameworthy, although in the petition of the Rensselaer that claim was made. Here the claim is reiterated, and the appellant, for the first time, joins in it, although admitting that the Shenango was "in many respects a dead ship," and, while still contending that the entire fault was on the Rensselaer, the appellant takes the position that, "if there is a disposition to hold that the pushing of the Reidenbach on the bow of the Shenango contributed to the accident, then the blame should not fall on the Reidenbach, but should fall on the Shenango for not notifying the Reidenbach to cease."

· Thus there were two accidents to the Shenango, variously described as from 10 to 35 seconds apart, and it cannot be doubted that the collision with the breakwater grew out of the conduct of the tugs, without relation to the presence of the Rensselaer, or to any of her movements. That accident would have happened if the Rensselaer had not been there. It was well said by Judge Clarke, concerning this situation, that:

"Since it is not contended by any party to this suit that the collision with the Rensselaer at the bow of the Shenango occurred until after the ship had struck upon the wall of the breakwater, and since there is no movement of the Shenango described other than the winding process, except an attempt to drive her ahead almost at the moment of the collision with the breakwater wall, which effort came too late to be of service, it seems very clear that the movement resulting in her going upon the wall was due entirely to the action of the tugs unaffected by the approach of the Rensselaer, and unaffected by any action on the part of the Shenango."

[1] The Shenango was in charge of the tugs, ready to assist with her steam if called on by them to do so. It was her duty to conform to, and promptly obey, the signals given her. The Margaret, 94 U. S. 494, 496, 24 L. Ed. 146; Rebstock v. Gilchrist Trans. Co., 132 Fed. 174, 176 (D. C.); The W. G. Mason, 142 Fed. 913, 914, 74 C. C. A. 83 (C. C. A. 2).

[2] Admitting that the Shenango would not be relieved of all of the responsibility attending a reasonably prudent master conscious of a danger he might avert even while being towed, yet there is nothing in the record to even suggest a fear on the part of those in her charge that her stern was in danger of collision with the breakwater. That collision, under the circumstances, raised against the tugs a presumption of negligence (The Webb, 14 Wall. 406, 414, 20 L. Ed. 774; The W. G. Mason, 142 Fed. 913, 915, 74 C. C. A. 83; The Kalkaska, 107 Fed. 959, 47 C. C. A. 100); and the burden of proof is upon both the tugs to show that they exercised due care (In. & Sea Coast Co. v. Tolson, 139 U. S. 551, 11 Sup. Ct. 653, 35 L. Ed. 270; Rose v. Stephens & Condit Trans. Co. [C. C.] 11 Fed. 438; The W. G. Mason, 142 Fed. 913, 915, 74 C. C. A. 83).

[3, 4] The Sunol had the lead, and her negligence was gross. The Reidenbach, also, cannot escape the charge of negligence with respect to both collisions. Her captain did not even notice what the draft of the Shenango was, and, although he was working on the same side of her as was the Sunol, says he did not see the Sunol that night. He had no idea how near the breakwater the stern of the Shenango had reached, and says he did not hear the signals between the Sunol and the Shenango just before she grounded at the breakwater. He knew the harbor well, and if he had been attentive he would have known that the Shenango was too far down the harbor for safety, knowing, as he did, how rapidly the space for turning fell away at the north. Both tugs were to blame for the first collision, and a consideration of all the facts leads to the conclusion that both were to blame for the second also.

That the officers of the Rensselaer, proceeding into the harbor in the usual way for the operation in which she was engaged, did not apprehend any danger, is clear; for, as pointed out by Judge Clarke, they did not change the course of their ship from what it would have been if the Shenango had not been in the vicinity. He also shows, irrespective of the testimony of the first mate of the Shenango, that the tugs were relied on to do their duty; that "what they did is consistent only with the existence of the conclusion in their minds that there was no danger of a collision between the ships if the tugs did what was expected of them."

Surely the respective masters of these ships had no reason to suppose that the winding process would be carried out by the tugs in a way dangerous to their vessels, and, still less, that the operation would be performed so carelessly as to ground the Shenango's stern at the breakwater. These ships were well manned, and the officers of each were on the lookout. As it was, the Rensselaer nearly cleared the Shenango. It is no excuse for the captain of the Reidenbach to say that the bow of the Shenango, towering above him, stood in the way of his seeing the Rensselaer, and that he did not hear her signal that she intended to take the course she pursued, because the operation of pushing the Shenango's bow around did not begin until her bow was clear of the easterly dock, and, prior to that, in guiding the bow out of the river, he knew, or ought to have known, that the Rensselaer was at the entrance of the harbor for the purpose of coming in. He heard the exchange of the alarm signals between the Shenango and the Sunol at about the time the winding process began. Apparently he thought his sole duty lay in pushing the bow of the Shenango around as fast as possible, and he was thoughtless or regardless of every other consideration. He says he did not see the Rensselaer until her bow shot past the Shenango's bow. Even so, unless he was pushing too hard, he could have backed on his short tow line and controlled the course of the Shenango's bow with his powerful tug. He attempted to do so and failed, because the impetus he had given the Shenango's bow was too great to be overcome in the short time between seeing the Rensselaer's bow and the time the Shenango's bow struck the Rens-

selaer about midships.   Not only was a part of the entire movement of the Shenango in his charge, but it was his duty to see to it that he did not take his tow into a situation of danger.  Spencer on Mar. Coll. p. 270.

Assuming he did all he could to prevent the accident at the moment, yet "this will not excuse him, if, by timely measures of precaution, the danger could have been avoided."  The Syracuse, 12 Wall. 167, 172, 20 L. Ed. 382.  It will not do for him to say that the first mate of the Shenango, standing near her bow and apprehending no danger, should have notified him of the Rensselaer's proximity; for he either knew, or ought to have known, that fact.  His heedlessness was similar to the lack of attention of the captain of the tug Abbott to the bridge in Great Lakes Towing Co. v. Masaba Steamship Co., 237 Fed. 577, —— C. C. A. ——, decided by this court December 5, 1916.

The duty sought to be laid upon the Rensselaer of waiting outside the entrance until she saw what the movement inside was to be, for which several shipmasters gave testimony, cannot be arbitrarily laid down.  The testimony fell far short of establishing a custom, and such a duty could only be said to exist under circumstances requiring a prudent master to appreciate it.  We see no reason why the Rensselaer should not have proceeded as she did, whether the Shenango in fact intended to come out of the harbor, or only make the maneuver of winding in it.

It is claimed, too, that the Rensselaer, after signaling her intention and receiving no response, as was the fact, should, under the rules, have waited until the failure to respond was explained, and would, by so doing, have avoided the collision.  The answer is that she did not need a response to her signal when she saw what the maneuver inside the harbor was.  See The New York, 175 U. S. 187, 201, 20 Sup. Ct. 67, 44 L. Ed. 126, and cases there cited.

The appellant would have the Reidenbach absolved in any event, likening the case to The W. G. Mason, 142 Fed. 913, 74 C. C. A. 83, which is in a number of respects like this, having the features of common ownership in the tugs and their joint service in the common enterprise.  There one of the tugs was exonerated because she was acting independently in what she did.  That case was considered and distinguished by this court in Thompson Tow. & Wreck. Ass'n v. McGregor, 207 Fed. 209, 214, 124 C. C. A. 479.  Whether or not this court would, in a similar case, adopt the rule established by the Second Circuit in the case of The W. G. Mason, need not be decided, because this case differs from that in the essential feature that here the tug sought to be exonerated was at fault.

The District Court exonerated the Shenango and the Rensselaer, and laid responsibility for the collision upon the two tugs.  We think this was right.

The decree below will therefore be affirmed at the appellant's costs