## THE CROMWELL.

### (District Court, E. D. North Carolina. October 10, 1917.)

### No. 143.

1. SHIPPING ☞86(2)—LIABILITY OF VESSELS—INJURY TO BRIDGE.
   Evidence *held* not to sustain an allegation that a ship in tow was negligent in undertaking to pass up through a bridge over Cape Fear river on a flood tide and in consequence struck a pier, but to show that the tide was at the time high slack, which was the proper condition for the passage, although the water on the surface in the center of the current was still moving upstream.

2. SHIPPING ☞81(2)—LIABILITY FOR INJURY TO BRIDGE—VESSEL IN TOW.
   The steamship Cromwell, passing up the north branch of Cape Fear river in tow of a tug, which was usual and necessary, struck a pier of the railroad bridge. The master of the tug, as was customary, was on the ship and directed the movements of both vessels; the master and crew of the ship taking no part, except to carry out his orders, which were promptly obeyed. The master of the tug and the pilot in charge of it were both competent and licensed masters and pilots, acquainted with the river, and both tug and tow were seaworthy, in good condition, and properly equipped. The draw of the bridge was near the west shore, and extended diagonally with the channel, making it necessary, in order to enter it from the south, to go so close to the bank that the Cromwell, which was a large vessel, sheered to starboard when 100 feet below the draw. The master of the tug took such measures as in his judgment were proper to prevent the collision, but they were unavailing. *Held*, that the Cromwell was not in fault, nor liable for the injury to the bridge.

3. TOWAGE ☞19—INJURY CAUSED BY TOW—LIABILITY.
   The relation between a vessel and a towing tug employed in the usual and ordinary course is not that of principal and agent, but of independent contractors, and the master of the tug, who in accordance with general custom assumes control of the navigation of both vessels, remains the servant of the owner of the tug, and the tow is not liable for injury to third persons, caused by his negligence or the fault of the tug.

In Admiralty. Petition by the Franco Ottoman Shipping Company, Limited, owner of the steamship Cromwell, for limitation of liability. Hearing on claims of the Wilmington Railway Bridge Company and others. Decree for petitioner.

John D. Bellamy, Thos. W. Davis, and Herbert McClammy, all of Wilmington, N. C., for claimants.

George Rountree and J. O. Carr, both of Wilmington, N. C., and Kirlin, Woolsey & Hickox, of New York City, for petitioner.

CONNOR, District Judge. The Cromwell is a steel screw steamship, 3,086 tons gross and 1,977 tons net register, built 1894, 312 feet long, 43 feet wide, 21–10 feet depth of hold, owned by Franco Ottoman Shipping Company, Limited, a British corporation; Nathaniel Wicklen, captain. She came to the port of Wilmington, N. C., Janu-

ary 2, 1914, with cargo of pyrites, consigned to Seaboard Air Line Railway. After unloading a portion of her cargo at Wilmington, her agent, Henry Whyte, contracted with the owners of the steam tug Gladiator to tow her up the Cape Fear river to the Swift Company fertilizer factory, for the purpose of delivering the remainder of her cargo.

At about 6:15 o'clock on the morning of January 7, 1914, Capt. Sanders, in control of the steam tug Gladiator, took the Cromwell in tow from the slip, at the dock of the Seaboard Terminal wharves, and started up the Cape Fear river. At some minutes after 7 o'clock, in passing through the draw of the bridge, constructed and maintained by the Wilmington Railway Bridge Company, the Atlantic Coast Line Railroad Company, and the Seaboard Air Line Railway Company, over the northeast branch of the river, she collided with and injured one of the piers of the bridge. Each of the corporations instituted civil actions against the Cromwell in the superior court of New Hanover county for the recovery of damages alleged to have been sustained by reason of the injuries sustained by the collision. Warrants of attachments were issued and levied upon the ship. Bonds were filed and she was released. The amount claimed by the claimant corporations aggregated about $60,000. Thereafter the steamship Cromwell and her owners filed in this court a libel, pursuant to the provisions of sections 4283, 4284, and 4285, Rev. Statutes (Comp. St. 1916, §§ 8021–8023), denying, and claiming limitation of, liability. A stipulation was filed in accordance with the statutes and general admiralty rule 54 (29 Sup. Ct. xlv). Pursuant to the petition, this court took jurisdiction of the cause and issued the usual orders. The cause was brought on for hearing upon the libel and answers, when the bridge company and railroad companies, hereafter referred to as the claimants, conceded the right of the owners, hereafter referred to as petitioners, to limit their liability, to an amount which shall be found by the court to be the value of the ship and pending freight money on the day of the collision. The claimants filed specifications setting forth the grounds of negligence charged against the Cromwell. Eliminating formal language, the claimants charge:

"That the Cromwell, its agents and servants, the master and pilot, permitted and directed the ship to proceed up the Cape Fear river, in tow of the Gladiator, at a time when the current was flowing upstream, and under conditions when it was dangerous to navigate and carry a ship of the size of the Cromwell through the draw at the said bridge."

[1] It is conceded that prudent navigation required that the ship be taken through the draw of the bridge when the tide was slack high water. The reasons given are manifestly sound. A number of witnesses were examined in regard to the condition of the tide at the hour at which the tug, with the Cromwell, reached the bridge, about 20 minutes after 7 o'clock on the morning of January 7, 1914. The tide in the river on that morning, at Wilmington, was high at 6:09 o'clock. The tug, with the ship, left the dock at about 6:15 o'clock. The oral and natural evidence show that the tide, at the bridge, an hour thereafter, was high slack. The evidence to the contrary is that of several

men standing on the bridge, who say that the tide was running up the river when the tug and Cromwell reached the bridge. They further say that cross-ties knocked from the bridge, by the ship, floated up the river, and continued to do so, until nearly 8 o'clock. This may be true, because of the fact that, after the lower current slacks or ebbs, the water upon the surface continues for awhile to move upward. Judge Clifford notices this condition in Sturgis v. Boyer, 24 How. at page 120, 16 L. Ed. 591, saying:

"It was then about slack highwater, the current still running up a little out in the stream; but the tide had commenced to ebb close in shore."

Several witnesses testify that the same condition is found in the Cape Fear river. The Bangor, 212 Fed. 706, 129 C. C. A. 316. I am of the opinion, upon a careful examination of the evidence, that the charge of negligence, in respect to the condition of the tide, is not sustained. The captain in charge of the tug was fully cognizant of the necessity of reaching the bridge when the water was high slack, and carefully timed his movement to conform to such well-known necessity.

[2] The next specified act of negligence is that:

"The ship was, by its master and those in charge of her, negligently and carelessly permitted to sheer to starboard, at about 500 or 600 feet below the bridge, at which time nothing was done by the master and those in charge of the ship to correct the said sheer, but, to the contrary, what was done aided and facilitated a greater sheer, without the engines of the said ship being operated, and without any command or order given, or any operation of the ship to straighten the ship's course."

The evidence is contradictory as to the distance from the bridge at which the ship sheered. Claimants charge that the sheer was caused by negligent navigation. Petitioners charge that it was caused by the necessity imposed upon the tug and ship in getting in position to go through the bridge, by reason of the location of the draw, or that the sheer was the result of an inevitable accident. It may be assumed pro hac vice that the law imposes upon the petitioners, denying liability, the duty of going forward with proof, or that the fact that the ship sheered imposes upon her owners the duty of showing that it was not the result of negligence in her navigation. Captain Sanders was in control of the tug Gladiator. He holds a United States license as master, mate, and pilot of steamships on Cape Fear river and tributaries; has had 30 years' experience. Capt. Sellars, also a pilot, was on the tug, subject to Sanders' orders. Sanders says that, leaving Wilmington at about 6:15, he consumed about an hour in reaching the bridge, about three-fourths or seven-eighths of a mile, going very slowly; not half a mile an hour. He says:

"We necessarily have to get against the west bank; it is a difficult matter to get those ships just in the right position because the draw was so narrow, and to the west side of the river; the difficulty is due to the fact that you have to swing your vessel into the channel, that takes you through the draw, on the west side of the river; the draw is 60 feet wide and is not located straight across the channel."

He was in the center of the ship, watching the center of the draw; just a little down the river from the shingle mill the vessel took a slight

217 F.—14

sheer; she was going very slowly. He says that the vessel was proceeding on her own steam; the tug was steering, assisting her.

Capt. Wicklen was standing by the side of Sanders, as the ship, with the tug, went up the river. He says the ship was going apparently straight for the center of the draw of the bridge, when she took a sudden sheer to starboard. She was drawing, after unloading a portion of the cargo at Wilmington, 15 feet 11 inches aft, and 15 feet 4½ inches forward; that the vessel began to sheer about 50 or 60 feet from the bridge. He knew nothing about the river; he had no knowledge of the place; he was not controlling the ship. Capt. Sanders was in control. She was going very slowly, being towed by the tug; knows nothing whatever about the channel; that is why he engaged a pilot; does not know where the channel of the river is; when the ship was straightened up (at Wilmington) the engines were stopped; took Capt. Sanders because witness had no local knowledge; has been a seafaring man 30 years; captain of vessels of this class about 13 years. None of the Cromwell's officers had any knowledge of the channel or other conditions of the river.

Capt. Sellars had license as pilot on Cape Fear and tributaries about 20 years; was on tug Gladiator, towing the Cromwell; was steering the ship. She was moving on her own power; very slow; hawser 12 or 15 fathoms.

"She was headed into the draw, not direct into the draw, because we can't; we had to get her between the shingle mill and the bridge before we could head straight into the draw; have to make a turn right at the shingle mill. After we passed the mill, the ship was headed straight for the draw. After the ship's stern passed it, she was then lying straight with the draw, in the position to go through. I had entered the draw with the tug, was into the drawbridge, and an order was given from the ship to stop towing. I took it to be Capt. Sanders' voice, and I stopped the tug and stepped out of the pilot house, and I noticed the ship had sheered to the east going to the bridge. She took a sheer after she was straight. I don't know just how far that was [from the bridge]. I think her bow was down about the end of the compress then; the end next to the bridge. I am not positive about it. I was noticing the tugboat, and not the ship. The draw is located at the western end, right next to the western bank. It opened in a bias direction from the channel. When you go through this draw, you have to make a turn; there is a sand shoal north of the bridge, out in the middle of the river, and when you get through the draw you have to pull the ship around in order to get straight up the channel again. On the lower side of the draw, as you approach it, the vessel has to straighten itself to proceed through the draw, after passing the shingle mill. At the time it straightens itself to enter the draw, her stern would be between the southern end of the compress and the shingle mill. When a ship of the size of the Cromwell is straightened to pass through the bridge, her bilge would be right close to the western bank of the river, but not up against it; so close that it would cause the ship to sheer from the bank. The worst danger is that the draw is placed so that the current does not run straight with it; it runs kinder across it; you have got to get your ship so close to the western bank that it causes it to sheer from it. And the other difficulty is a shoal on the north side; and it is just simply close work taking a vessel through, that is all."

The tug was used to help steer the Cromwell. Saw nothing after the ship passed the shingle mill to indicate that she was not pursuing the proper course until the sheer, just at the draw.

Watkins, claimants' witness, says that he saw the ship coming up, opposite the shingle mill.

The tug was in the channel trying to hold the ship in the main channel, "which she did, and approached in the draw straight." The ship was bearing out to the east. The first thing he saw was throwing out the anchor, about 60 feet below the bridge; it did not stop her. He says that the ship "began to sheer 70 or 100 yards down the river." The tug was approaching the draw in the proper way.

Coker places the ship about the same place when she began to sheer. He says that the channel is very close to the west side of the river at the shingle mill; does not know the depth. Merritt's evidence in regard to position of ship when she sheered is to about the same effect.

The foregoing constitutes the substance of the evidence regarding the condition under which, and the place at which, the ship took the sheer.

· Capt. P. T. Dicksey, 67 years of age, has unlimited license to manage steamships up and down Cape Fear and North East river; has held license since 1880, unlimited 10 years; is familiar with navigation of the rivers and the location of the bridge. He corroborates the other witnesses regarding the condition of the tide, at which a ship should go through the bridge.

"The reason we use slack water for taking vessels up there, when they are drawing any water at all, is because the bridge was not parallel with the tide, and it was very narrow, and in going up there, if ebb tide, the tide running diagonal across it in such a way that it would sheer off into the channel above, that is going north; of course, you couldn't go very far up there on account of the shoal above. * * * The bridge was put there when there were small vessels going through; it was intended for smaller vessels than the class of vessels we have been carrying through there lately. You have to make a slight bend about the shingle mill. Before entering the draw, I always keep the middle of the river. I headed ship direct for the middle of the draw when I would land her; it would throw me crosswise, or diagonally across, but I would have to kinder make a turn at the bridge on account of the shoal water below it. The bridge is situated in such a way, if you get the vessel, so you can look through the draw, you would pass so close to the shoal water that she would naturally take a sheer; that is, when you would straighten the vessel after you had left the center of the river to go through the draw. The draw was not parallel with the current; when you straighten the vessel the stern is near the shore; this makes her sheer off, what we term 'smelling bottom'; always sheers from the bank for deep water, if going ahead at all. The draw is in such a place that you can't get in there without getting the ship alongside of the bank."

During the year 1910, the Association of Masters, Mates and Pilots, of which Capt. Dicksey was then president, filed a protest with the United States engineers in regard to the location and width of the draw, etc. On August 24, 1910, the Secretary of War ordered the bridge company to "modify the present fender system, and construct additional fenders on the eastern side of the draw space of said bridge; all as indicated on the attached blueprint, so as to provide an additional width of four feet in the draw opening and a better draw entrance." The company was given six months within which to comply with the order. Thereafter the Secretary of War modified the order in certain respects, and extended the time for compliance. There was much evidence

regarding compliance with these orders, and conditions at the time of the accident. It is sufficient to say that the width of the draw and its location, at the time of the collision, had not been condemned by the Secretary of War; the bridge was not, at that time, an unlawful obstruction to navigation. The location and width of the draw is relevant only as explaining the necessity for navigating ships passing through, to go close to the western bank, as testified to by all of the witnesses. Since the bridge was built (1880) several large fertilizer factories have been built on the northeast branch of the Cape Fear, above the bridge. The size of the ships going up the river, carrying supplies to the factories, has increased within the last few years. Ships of the size of the Cromwell frequently pass through the draw going up the river to these factories. The Cromwell, in tow of the tug, was entitled to navigate the river, and in doing so, to deliver her cargo, to pass through the draw. The owners of the Cromwell, and their representative, Capt. Wicklen, were entitled to assume that, when the draw was opened, the ship, by the exercise of the degree of care imposed upon them in navigating the river, could pass through the draw with safety to both the ship and the bridge.

The law imposed upon those in charge of the ship and the tug, the duty of careful navigation, in view of such conditions as were known, or by the exercise of the degree of care imposed upon them, could have been ascertained. Wicklen says, and is not contradicted, that he was ignorant of the condition of the river and the channel. He says that the engines of the ship were not working; that she was being moved by the tug. Sanders and Sellars say that she was moving upon her own steam; the tug only assisting, steering her. She was moving very slowly, and the tug stopped towing, the hawser slacked. It is probable that all of the witnesses honestly thought the fact to be as they testified, and that at the time the ship took the sheer her engines were not working. There was no negligence in her speed, nor does it appear that she took the sheer by reason of any defect in her equipment. If the draw in the bridge was so located, with reference to the channel, and was of such width, as to render it necessary for the ship to go near to the western bank of the river, and subject her to the danger of taking a sheer, in straightening for approaching the bridge, claimants should not be permitted to impute to her, as negligence, the course pursued, for the purpose of meeting the condition created by the location of the draw. In other words, the fact that, for the purpose of getting into position to pass through the draw, she went close to the western bank, should not be charged as negligence per se, although in doing so she incurred danger of taking a sheer. The claimants say that the Cromwell, by going near to the western bank of the river, was permitted to take a sheer, and that this was negligence. The petitioners say, conceding that, by going close to the western bank of the river for the purpose of straightening, to pass through the draw, the ship was in danger of taking a sheer, the location of the draw, and its width, rendered it necessary to go near the western bank. This is not upon the theory that the bridge company negligently located the draw, but because, in doing so, it created a condition which rendered it necessary for the ship, in going up the river, in the exercise of its right of navigation, to go

nearer to the bank than good navigation, under other conditions, justified.

The evidence does not disclose that the sheer, to which ships of the size of the Cromwell were liable, in going near to the west bank, necessarily or usually resulted in injury to the bridge. It appears that ships of the same, or larger, size had pursued the same course and passed through the draw safely. I am of the opinion that the ship was not negligent in pursuing the usual, and, as testified to by all of the witnesses, necessary, course in getting into position to go through the draw. It does not appear that, in exercising the right to approach the bridge, in the usual manner, those in control of the ship negligently navigated the ship; she was moving slowly, whether under her own steam, or with the assistance of the tug, does not very clearly appear; the witnesses differ in that respect, but all say that she had but little speed. Her engines, as appears, were in condition to respond promptly to a call upon them. None of her officers or crew failed in the performance of any duty imposed upon them at that time.

But claimants say the master of the ship and of the tug negligently failed to correct the sheer in time to prevent the collision. Upon seeing that she had sheered, Sanders gave the order to Capt. Wicklen, who stood by the indicator, to starboard the wheel, to go to port. He says:

"I saw she was not going to come; the only thing to do was to go full speed on the engine astern, and drop anchor, and the tug to cease pulling, which we did."

Each of these orders were communicated promptly to those who were required to execute them, and promptly obeyed. Knute Anderson says that he got the order to keep the wheel hard over starboard, which he did; the wheel was all right. Tiltz says that he promptly let go the anchor; it had 15 fathoms chain; it sunk; the chain tightened. The engine was put astern. Sellars says that he heard the order to stop towing, and at once stopped the tug, and the hawser slackened. There is no evidence to the contrary. Capt. Wicklen's statement is reasonable. It was the purpose of Sanders to carry her to, and through, the draw very slowly. When Sellars got the order to stop towing, the tug was in the draw. Sanders says that his orders were given to Capt. Wicklen; "they were to go through the captain, in every instance;" that he (Sanders) was in control of the ship. Wicklen was asked if he was controlling the ship himself, under orders from the pilot, to which he answered:

"No, I was not." "Who was?" "The pilot, Capt. Sanders."

As corroborating this testimony, and showing the custom prevailing on the river, when ships are being towed, J. S. Williams, who has had much experience in towing ships up the river and through the bridge, says that the custom was for the captain of the tug to go on the ship—place a pilot on the tug; the captain of the tug to be in command of the tow. He says:

"We have refused to navigate the tow whenever anybody else tried to assume the authority."

The captain of the tug goes on the ship and takes command of the movement, leaving a properly licensed pilot on the tug, who obeys the

orders of the man on the ship, who is in command of the whole movement. Capt. Edgar Williams, harbor master, who has had license since 1866, long experience in towing ships up the river and through the bridge, large ships, says:

"When I went on board the ship, I would notify the captain that I was in charge of the ship and also in charge of the tugboat, which would be at my command and subject to the orders that I gave. That is the proper place for the master of the tug. The ship has no pilot on board; the master being a stranger, it is necessary for the master of the tug, or pilot, to go aboard and take charge, and, when he goes, then they are subject to his orders, and also the towboat; that is the custom of every port."

Capt. Dicksey, who has had many years' experience in towing ships up the river, through the bridge, says that as captain of the tug he always went on board the tow—ship—and commanded the movement; orders were given the tug from the ship.

"In every case—I don't think you will find a single instance where it is different—the man who has charge of the tow is on the ship, and he controls the movement of the tug, by waving his hand, or some signal they have."

There is no evidence indicating that the Cromwell was not in good condition, her engines or other equipment, nor that the tug was not in good condition and properly equipped for the service undertaken. The claimant insists that the order given, to "starboard the wheel," was not the proper order. A number of witnesses were examined in regard to this contention. Capt. Dicksey says that was the only order that a careful man would give, after he found that she had taken a sheer. J. S. Williams is of the same opinion. Capt. Edgar Williams, a witness for claimant, gives the same opinion, although he thinks, under the conditions, "the wheel is no good."

Two witnesses for claimants, Rice and Burriss, are of the opinion that the order to starboard the wheel was not the proper one to give. Each of the witnesses gives reasons for the opinions which they express. Criticism is made of the fact that only one anchor was dropped. It is strongly urged that two anchors would have brought her to a stop, and that the engines should have gone forward, and not astern.

[3] If, as contended by claimants, Capt. Sanders was negligent in failing to take prompt and proper steps to break the sheer, or to stop the Cromwell, the question arises whether such negligence is to be imputed to the ship and her owners. The answer to this question depends upon the relation which Sanders bore to the ship and the extent to which he was in control of her navigation. It is held in The China, 7 Wall. 53, 19 L. Ed. 67, that where there is compulsory pilotage the ship is liable for a tort, although it be wholly the result of the pilot's negligence. The Merrimac, 14 Wall. 199, 20 L. Ed. 873; Sherlock v. Alling, 93 U. S. 107, 23 L. Ed. 819. The principle upon which the liability of the ship is based is that the pilot is the agent or servant of the owner of the ship. Petitioners, conceding this to be true, insist that this case comes within the principle announced in Sturgis v. Boyer, 24 How. 110, 16 L. Ed. 591, in which Judge Clifford, after stating cases in which both the tow and the tug, and those in which the tow alone, is liable, says:

"But whenever the tug, under the charge of her own master and crew, and in the usual and ordinary course of such an employment, undertakes to transport another vessel, which, for the time being, has neither her master nor [his] crew on board, from one point to another, over water where such accessory motive power is necessary, or usually employed, she must be held responsible for the proper navigation of both vessels; and third persons suffering damage through the fault of those in charge of the vessels must, under such circumstances, look to the tug, her master, or owners, for the recompense which they are entitled to claim for any injuries that vessels or cargo may receive by such means. * * * Assuming that the tug is a suitable vessel, properly manned and equipped for the undertaking, so that no degree of negligence can attach to the owners of the tow, on the ground that the motive power employed by them was in an unseaworthy condition, and the tow, under the circumstances supposed, is no more responsible for the consequences of a collision than so much freight, and it is not perceived that it can make any difference in that behalf that a part, or even the whole, of the officers and crew of the tow are on board, provided it clearly appears that the tug was a seaworthy vessel, properly manned and equipped for the enterprise, and from the nature of the undertaking, and in the usual course of conducting it, the master and crew of the tow were not expected to participate in the navigation of the vessel, and were not guilty of any negligence or omission of duty by refraining from such participation."

After stating the general principle upon which vessels, and their owners, are liable for injuries sustained by the negligence of their agents, he says:

"No such consequences follow, however, when the person committing the fault does not in fact, or by implication of law, stand in the relation of principal and agent, the injured party cannot have his remedy against the colliding vessel. By employing a tug to transport their vessels from one point to another, the owners of the tow do not necessarily constitute the master and crew their agents in performing the service. They neither appoint the master of the tug or ship the crew; nor can they displace either the one or the other."

The tow, in that case, was relieved of liability for the collision because, as said by Judge Clifford:

"It clearly appears that those in charge of the steam tug had the exclusive control, direction, and management of both vessels, and that there was no evidence that the tug was not a suitable vessel to perform the service for which it was employed, that any one belonging to the ship participated in the navigation, or was negligent in any degree whatever in the premises."

In Dutton v. The Express, 3 Clif. 462, Fed. Cas. No. 4,209, Judge Clifford says:

"Masters of vessels in tow * * * are bound to obey all the proper orders of the master of the steam tug, as the chief responsibility for the navigation of both vessels rests upon that officer, and if the master of the tow refuses such obedience, or is guilty of negligence and carelessness, or want of due skill and judgment in the performance of his duties, the owners of the steam tug are not liable for the consequences to the owners of the tow. Somewhat different rules apply in cases where the rights of third persons are involved."

See The Margaret, 94 U. S. 494, 24 L. Ed. 146; Towing Co. v. Shenango, etc., 238 Fed. 480, 151 C. C. A. 416.

In The John Fraser, 21 How. (62 U. S.) 184, 16 L. Ed. 106, it appeared that the James Gray was at anchor in the port of Charleston, S. C., and the John Fraser was being towed into the harbor by the

General Clinch, when a collision occurred between the John Fraser and the James Gray. The owners of the latter libeled both the John Fraser and the General Clinch. The James Gray and General Clinch were found guilty of negligence. In regard to The John Fraser, Judge Taney says:

"According to the usage of trade at that port, she engaged a steamboat, well acquainted with the harbor and its usages, to bring her in. When fastened to the hawser, and in tow, she was controlled entirely by the steam tug, both as to her course and speed. The steamboat was not subject to the orders of the commander of the John Fraser, but was altogether under the control and direction of her own commander for the time. * * * And as this collision was forced upon the John Fraser by the controlling power and mismanagement of the steam tug, and not by any fault or mismanagement on her part, she ought not to be answerable for the consequences."

In The Clarita, 23 Wall. 1, 23 L. Ed. 146, after stating the general rule fixing liability upon the ship, the same judge says:

"Consequences of the kind, however, do not follow when the person committing the fault does not in fact, or by implication of law, stand in the relation of agent to the owners. Unless the owners, and the person or persons in charge of the vessel, sustain in some way towards each other the relation of principal and agent, the injured party cannot have his remedy against the colliding vessel. By employing a tug to transport their vessel from one place to another the owners of the tow do not necessarily constitute the master and crew of the tug their agents in performing the service, as they neither appoint the master of the tug, nor employ the crew, nor can they displace either one or the other. Their contract for the service, even though it was negotiated with the master of the tug, is, in legal contemplation, made with the owners of the vessel employed, and the master of the tug continues to be the agent of the owners of his own vessel, and they are responsible for his acts in navigation and management."

In The Civilita, 103 U. S. 699, 26 L. Ed. 599, both the ship and the tug were held liable for a collision. The reason given for holding the ship liable was:

"Because her pilot, who was in charge both of ship and tug, neglected to give the necessary directions to the tug," etc.

In The Eugene F. Moran, 212 U. S. 466, 29 Sup. Ct. 339, 53 L. Ed. 600, both tow and tug were found to be in fault. Judge Holmes, referring to Sturgis v. Boyer, supra, says:

"In that case it was held that a tug, having control of a vessel in tow, was solely responsible to a lighter upset by the vessel, through the fault of the tug alone. * * * We see no reason why the decision should not stand. No doubt the fiction that a vessel may be a wrongdoer, and may be held, although the owners are not personally responsible, on principles of agency, or otherwise, is carried further here than in England. * * * Possibly the survival of the fiction has been helped by the convenient security that it furnishes, just as no doubt the responsibility of a master for a servant's torts, that he has done his best to prevent, has been helped by the feeling that it was desirable to have some one who was able to pay. ' * * * But, after all, a fiction is not a satisfactory ground for taking one man's property to satisfy another man's wrong, and it should not be extended. There is a practical line, and a difference in degree, between the case where the harm is done by the mismanagement of the offending vessel and that where it is done by the mismanagement of another vessel to which the immediate, but innocent, instrument of harm is attached."

In The Maria Martin, 12 Wall. 31, 32, 20 L. Ed. 251, Judge Clifford after stating the principle announced in Sturgis v. Boyer, supra, says:

"Where the officers and crew of the tow, as well as the officers and crew of the tug, participate in the navigation of the vessels, and a collision with another vessel ensues, the tug alone, or the tow alone, or both jointly, may be liable for the consequences, according to the circumstances, as the one or the other, or both jointly, were either deficient in skill or were culpably inattentive or negligent in the performance of their duties."

In that case it was conceded that the tug was not in fault. The controversy was between the two ships.

In The Gallia (D. C.) 196 Fed. 509, it appeared that there was a pilot on the ship, but he gave no orders. The captain of the tug came on the ship and remained until the maneuver was completed. Judge Hough said that:

"The mere presence of the pilot makes no difference. * * * Responsibility and liability must depend upon matters of substance, and not on mere form. If the pilot had really been in command, the ship would have been primarily responsible, even though the proximate cause of the damage had been the disobedience or incompetence of tug masters who were furnishing the motive power. But this pilot was not in command and he was guilty of no personal negligence. Therefore, the ship with which he is identified is absolved."

The principle is applied by Judge Morris in The Margaret Thomas (D. C.) 183 Fed. 336. The schooner, in tow, was absolved, because the fault, resulting in damage to the libelant, was imputed to the tug.

In the Ft. George, 183 Fed. 731, 106 C. C. A. 169 (C. C. A. 2d Cir.), the tug Smith, and the bark in tow, Ft. George, were libeled for damages sustained by the Vim, caused by a collision with the bark. The tug had the bark in tow on the Delaware river. Because of taking her into shallow water, she sheered and refused to answer to her helm, thus colliding with the Vim, anchored near the center of the river. Judge Coxe says:

"It is obvious that the expedition down the river could not have been taken under the joint command of the master of the tug, and the pilot of the bark. There can be no divided responsibility in such cases. Conference, discussion and agreement as to what course to pursue, when danger threatens, between two vessels, separated by a 70-fathom hawser, is out of the question. Some one must be in command. We understand the rule to be, in the absence of any agreement to the contrary, that, when the tug supplies the motive power, she becomes the dominant mind and the tow is required to follow directions from the tug. * * * It is probable that no sane tug master would accept a service so commanded; but, if he had done so, it is more than likely that disaster would have occurred much sooner than it did. * * * There was nothing to indicate to those on the bark that there was any special danger to be encountered in passing the ridges. * * * For aught that appeared to the contrary, the bark was justified in thinking that the tug felt herself fully able to cope with the situation, even if the bark 'sucked the bottom.' * * * Those on the bark had a right to assume that the tug knew her own business and would pass the dredges safely."

In The De Gama (D. C.) 140 Fed. 755, Judge Toulmin says:

"The relation between the tug and tow, under the American decisions, under ordinary circumstances, is that of independent contractor, not that of principal and agent. In other words, the tug is not the servant or em-

ployé of the tow, and therefore the tow is not responsible for the acts of
the tug. If the tow collides with some vessel during the voyage, it is not
liable for the damage caused thereby, unless some negligence contributing to
the collision is proved against the tow, or unless the officers of the tow
were directing the navigation." Hughes Admiralty, 58, 59.

The judgment was reversed on appeal because the court differed
with the District Judge about the facts.

In The Chicago (D. C.) 78 Fed. 819, Judge Brown says:

"It does not appear that the captain, who was on the bridge of the Alvena,
took any part in the responsibility for her navigation. Though the naviga-
tion was procured for the Alvena, and was for her benefit, and was with the
acquiescence of her master, and though the damage was done by her, yet,
under the existing decisions of the appellate courts in this country, as
I understand them, I am not at liberty to hold the Alvena responsible."

In The Express (D. C.) 46 Fed. 860, the Niagara was found to be
in fault, together with the tug. Judge Brown says that her negligent
fault consisted in (1) unnecessarily going to the left-hand side of the
East River channel; (2) in not giving signals; (3) for turning shortly
before the collision; and in two of these negligent acts "the officers
of the Niagara were active participants."

Claimants insist that those in charge of the Cromwell were negligent
in failing to take prompt and proper steps to correct the sheer and
avoid the collision. There is some difference in the testimony in re-
gard to the distance of the ship from the bridge at the time she took
the sheer. E. A. Frink, principal assistant engineer of the Seaboard
Air Line Railway Company, testifies that from the center of the bridge
to the north end of the Cooper compress is 300 feet, and from the same
point to the shingle mill dock is 750 feet. Sanders puts the shingle
mill at 600 feet from the bridge. The evidence tends to show that the
ship took the sheer after her stern passed the shingle mill. Sellars
says that when he got the order to stop towing he was in the draw;
the hawser was 12 fathoms. Wicklen says that the ship was 50 or 60
feet from the bridge, when the order was given to let go the anchor
and put the wheel astern. Claimants' witnesses, on the bridge, give the
same distance. Sellars says that he thinks that when she took the
sheer her bow was about the end next to the bridge of Cooper's com-
press; he is not certain—was attending to the tug. Sanders says that
he gave the order to starboard the wheel—

"and we saw she was not going to come back again to take us on our port.
We had shouted to him to go to port. We saw she was not going to come, and
saw the only thing to do was to go full speed ahead on the engines astern,
and drop the anchor and the tug cease pulling, which we did."

This indicates that the order to starboard the wheel was given be-
fore the other orders; that some short time elapsed before the last or-
ders were given. Claimants insist (1) that the order to starboard the
wheel was wrong; (2) that two anchors should have been let go; and
(3) that the engines should have been put full speed forward, instead of
astern. Evidence was heard upon each of these contentions, disclos-
ing, as usual, differences of opinion; it is impossible to reconcile them.

I am of the opinion that the weight of the evidence sustains the pro-
priety of the course pursued, under the conditions existing at the time

the orders were given and obeyed. The weight of the evidence tends to show that the bow of the ship was, at the time, within 60 or 70 feet of the bridge. It is necessarily conjectural whether, if the engines had been put full speed ahead, she would have gone through the bridge safely. It is the same problem which is always presented, under such conditions—whether it is the part of wisdom to apply the brakes, or open the throttle; to tighten the rein, or drive ahead; to cross the track or stop. Men will, in each case, honestly hold different opinions. The rule of law, prescribing the duty, and fixing the liability, upon those upon whom the duty to act upon the "occasion sudden" or "in extremis" is settled; its application in given cases is not always easy. The rule of conduct is thus stated:

"When a collision is all at once seen to be suddenly impending, a vessel may, in the confusion and excitement of the moment, do something which contributes to the collision, or omit to do something by which the collision might be avoided, and unless the emergency has been produced by her own fault, or the act of omission amounts to gross negligence, it is excusable. At such time, the highest possible degree of skill is not required, but only such caution and skill as every one would be expected to exercise who took upon himself the command and navigation of a vessel." 7 Cyc. 307.

I am of the opinion that, in the course pursued in this respect, Sanders was not negligent. He exercised his best judgment; there is no reason to think that, by going ahead, he would have gone through safely. Claimants say that, if this be true, the steps to correct the sheer should have been taken before the ship was so near the bridge as to render them ineffectual. Sellars is asked:

"Under the circumstances that you saw at that time, when the vessel had sheered to starboard, just as you and the tug were in the draw, was that the proper order to give? A. Yes, sir."

Capt. Dicksey is asked:

"Suppose a ship you had taken up there had taken a sheer somewhere between 50 and 100 feet from the bridge, and the bow gone to starboard, and you wanted to stop her, would it not be good navigation to order let go the anchor, order the wheel to starboard, and order engines reversed? A. Yes, sir. I think that is about the only order that a careful man would give after he found she took a sheer, because you can't break a sheer in that short distance. I suppose that is the only proper thing to do."

J. S. Williams says that, assuming that in approaching this draw, when the ship got within 100 feet of the draw, she took a sudden sheer to the starboard, he does not know of any other order that could be given; it was the proper order. When he came back upon the stand to make his testimony clear, he said:

"I don't think that anything else could have been done after the ship was within 100 feet of the bridge; I want to go on record on that."

Capt. Edgar Williams is asked, by claimants:

"Assuming that the ship had steered to starboard, and that the anchor was not dropped until within 100 feet of the bridge, would that have been the proper place to have thrown the starboard anchor overboard, and could it have swung the ship to port? A. That being the case, no more than 100 feet, you couldn't give the ship sufficient chain to deaden her headway."

It will be noted that the assumption is made the ship took the sheer 100 feet below the bridge, and the answers are, with some care, confined to that hypothesis. Capt. Edgar Williams says that the anchor, let go at 100 feet below the bridge, after the sheer, would not deaden her speed. He is then asked whether, if the ship had taken the sheer at the shingle mill, 750 feet below the bridge, and the orders were given and obeyed, they would have "righted the ship." He answers: "Yes; that would have canted your ship to port." Upon cross-examination he is asked whether, assuming that the sheer to starboard was taken at Cooper's wharf, within 100 feet of the bridge, what was the proper order to give? He answered:

"That was rather close, but I would have said let go both anchors." "The wheel is no good."

The value of this testimony, as exculpating Sanders from the charge of negligence, is dependent upon the position of the ship, with reference to the bridge, at the time she took the sheer. I am constrained to think that she was more than 100 feet from the bridge when she took the sheer. She was between the shingle mill and the wharf.

I am unable to find that the tug, or those in charge of her, or the master of the ship, or any of her crew, were incompetent to discharge the duties imposed upon them. The questions which have given me most concern are whether Capt. Sanders took prompt and timely action to correct the sheer and bring the ship under control and thereby prevent the collision, and, if he did not, whether the Cromwell and her owners are liable for such failure and the results proximately flowing from it. The decisions uniformly recognize and follow as binding authority Sturgis v. Boyer, supra. Such apparent departure as an examination of the cases discloses may be explained by reference to the variant facts. The principle upon which the decisions are founded is that the owner of the tug is not the agent of the ship, but an independent contractor. The Cromwell was compelled to employ a tug to tow up the river. The owners of the tug were engaged in the business of towing ships up the river; in doing so the tug, under the direction and control of Capt. Sanders, was engaged in her usual and ordinary course of employment; there was a necessity for such accessory motive power. It was usually employed. The agent of the Cromwell, who was also the agent of the claimant Seaboard Railway Company, at Wilmington, employed the tug, agreeing to pay a fixed sum for the service. The owners of the tug, for the purpose of performing the service, selected the master and his assistants. The tug was a suitable vessel, properly equipped, and her master and assistant were competent persons, licensed pilots and masters, with long experience in the discharge of such duties, on the Cape Fear river and its northeast branch. They were familiar with the current, channel, depth, and location of the draw. The master, in accordance with the custom and well-recognized rules for towing ships of the size of the Cromwell, went upon her navigating bridge and took control of her navigation, leaving Captain Sellars a licensed pilot on the tug. All of them understood that he was in control of the ship, and that she and the tug were to be navigated in obedi-

ence to his orders.   His was the dominating mind; he was, in the language of one of the witnesses, "in control of the movement."

Claimants insist that the Cromwell was, at the time she took the sheer and of the collision, moving on her own steam, and therefore not a "dead ship" in tow of the tug; that the tug was only assisting—steering—the ship, and that her master and crew were in control of her navigation; that, if not entirely responsible for the collision, she participated in the negligent conduct of the master of the tug and is jointly liable.   It is well settled that the immunity from liability for the negligence of the tug is limited to cases where the ship, her master and crew, are free from fault, either in respect to any duty imposed upon them or participation with those in control of the ship and the tug.  The Galatea, 92 U. S. 439, 23 L. Ed. 727, in which Judge Clifford says that owners of ships—

"are under obligation to employ a seaworthy steam tug as the accessory motive power to their own ship or craft; and they continue to be responsible for the negligence, omission of duty, or unskillfulness of the master and crew of their own vessel."

It is further insisted that the captain of the Cromwell and his crew were on board the ship and participated in her navigation.   In regard to the controverted question whether the Cromwell was moving on her own steam, and not being towed, I think that, upon the weight of the evidence and the reason of the thing, her engines, as they should have been, were fired; that they were used in moving out of the slip at Wilmington and starting up the river; that as she approached the bridge they were not working.   She was being towed, for the purpose of being kept under the control of the tug, as she passed through the bridge.   All of the witnesses, and the natural evidence, indicate that she was moving on the hawser of the tug.   The tug and the ship were manifestly under the control of Capt. Sanders; all persons connected with her, and with the tug, recognized their duty to obey his orders, and did so.   It will be noted that, in the Civilita, supra, relied upon by claimants, "the ship had on board a pilot, and the tug was subject to his orders," and "it is expressly found, as a fact, that the tug actually received no orders from him."   It was his failure to give orders which caused the collision.   The tug was found to be also at fault, "and the ship, because her pilot, who was in charge both of ship and tug, neglected to give the necessary directions to the tug."

In The Express, supra, the tow was held to be at fault with the tug, because her officers "actively participated in the specific acts of negligence."   In The Clarita, supra, it is found that the master of the tug was in control; the tow was exonerated.   The conditions found in a very recent case, Great Lake Towing Co. v. Shenango, S. & S. Transp. Co., 238 Fed. 480, 151 C. C. A. 416 (C. C. A. 6th Cir.), present the question in respect to the relative duties of the tow and the tug under conditions somewhat similar to those found here.   Judge Hollister says:

"The Shenango was in charge of the tugs, ready to assist with her steam, if called on * * * to do so. It was her duty to conform to, and promptly obey, the signals given her [citing cases]. Admitting that the Shenango would not be relieved of all the responsibility attending a * * * prudent

master, conscious of a danger he might avert, even while being towed, yet there is nothing in the record to even suggest a fear on the part of those in her charge that her stern was in danger of a collision with the breakwater."

A decree exonerating the Shenango and fixing the liability for the collision was affirmed. I am unable to find that the fact that the master and crew were on board the Cromwell and at the positions where their duty required that they could promptly respond to the order of Capt. Sanders was, of itself, such a participation in her navigation as to make them liable for his negligence, either in respect to the time or manner of giving such orders. The condition in which they were brings them within the language of Judge Clifford in Sturgis v. Boyer, supra:

"It is not perceived that it can make any difference in that behalf that a part, or even the whole, of the officers and crew of the tow are on board, provided it clearly appears that the tug was a seaworthy vessel, properly manned and equipped for the enterprise, and from the nature of the undertaking, and the usual course of conducting it, the master and crew * * * were not expected to participate in the navigation of the vessel and were not guilty of any negligence or omission of duty, by refraining from such participation."

Measured by this standard, I am not able to find that the master, or any of the crew of the Cromwell were at fault. They promptly and correctly responded to the orders of Capt. Sanders, as it was their duty to do so. They were ignorant of the condition of the river, the depth of the water, or the current of the channel, as related to the location of the draw. Certainly they could not be called upon, under the circumstances, to anticipate danger, and take control of the ship and the tug out of the hands of Sanders; any attempt on their part to have a divided control would have been wrong, fixing upon them liability for the result. The language of Judge Morris in The Margaret Thomas, supra, appropriately describes the situation here and the measure of duty imposed upon the master of the Cromwell. He says:

"It is possible that something of that kind might have been done, but it is not fair, in considering a case of this kind, to imagine what might have been done if everything could have been foreseen. This schooner was in charge of her captain and a licensed pilot. * * * If they saw a danger which they could avoid by putting the schooner's helm to port, they should have done so; but they must have a little time to see the danger and consider it and act."

After careful consideration of the evidence and excellent briefs filed, I am brought to the conclusion that the Cromwell, and its owners, are not liable for the injury sustained by the collision with the bridge. A decree will be drawn in accordance with this conclusion.