## BISSO TOWBOAT CO. et al. v. UNITED STATES et al.*

(Circuit Court of Appeals, Fifth Circuit. May 7, 1925.)

No. 4455.

**Collision ⧉95(1)—Tow held In fault for collision with meeting vessel.**

A collision in the Mississippi 'off New Orleans between a steamship going up on the New Orleans side, which had practically stopped within 75 to 100 feet of shore to change pilots, and a descending steamship in tow of two tugs alongside, *held* due solely to the fault of the tow, in initiating the passing signal, contrary to the rules, and in not keeping to the right, for which there was ample room.

Appeal from the District Court of the United States for the Eastern District of Louisiana; Rufus E. Foster, Judge.

Suit for collision by the United States, owner of the dredgeboat Comstock, against the tugboats Captain Budd and Independent, the Bisso Towboat Company, claimant, and the steamship John D. Rockefeller, the Standard Oil Company (New Jersey), claimant. Decree for libelant against the tugs, and their claimant appeals. Affirmed.

Spencer, Gidiere, Phelps & Dunbar, of New Orleans, La., for appellants.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City, Lemle, Moreno & Lemle, of New Orleans, La., John M. Woolsey and Robert S. Erskine, both of New York City, and Hunter C. Leake, Louis H. Burns, U. S. Atty., and Edouard F. Henriques, Asst. U. S. Atty., all of New Orleans, La., for appellees.

Before WALKER and BRYAN, Circuit Judges, and BARRETT, District Judge.

BARRETT, District Judge. The following is the opinion of Foster, District Judge, in the District Court:

"This is a libel by the United States of America, owner of the dredgeboat Comstock, against the tugboats Captain Budd and Independent and the steamship John D. Rockefeller, to recover damages to the Comstock as the result of a collision with the Rockefeller on November 15, 1917, in the harbor of New Orleans, at about 5:30 p. m., at a point in the river near Pauline street. There is considerable conflict of testimony in the record. It is voluminous, but the material facts are undisputed, or are proved with reasonable certainty.

"It appears that the steamship Falls City,

*Rehearing denied July 25, 1925.

in tow of the tugs Independent and Captain Budd, the first named lashed to her starboard quarter and the other to her port quarter, and also using her own power to some extent, was on her way down the river from Westwego to Chalmette. The Rockefeller was going up the river, bound for Baton Rouge. At a point about opposite Pauline street, and perhaps 100 feet out from the bank, the tow and the Rockefeller came into collision, with the result that both the Falls City and the Rockefeller were considerably damaged. There was also some damage to one of the tugs. As a result of this collision the Rockefeller sheered into the bank and collided with the Comstock, which was moored to the dock at about the foot of Pauline street. There was no fault on the part of the Comstock, and the collision between her and the Rockefeller would not have occurred, but for the prior collision between the Rockefeller and the tow.

"The question of liability between the Falls City and the Rockefeller was litigated in the Eastern district of Virginia by libel and cross-libel, and resulted in a decree exonerating the Rockefeller from fault for the collision, but also holding there was no liability on the part of the Falls City, because she was completely in charge of the tugs, which were owned by an independent contractor. This decree was affirmed by the Circuit Court of Appeals. See 260 F. 982; 272 F. 67. The record in that case is introduced before me and considerable additional testimony was taken. There is no doubt that both vessels were in charge of competent pilots and had the usual required lights burning, although the question of lights is immaterial, as it was still daylight, and the lights had just been switched on.

"The testimony on behalf of the Rockefeller shows that she had gone close to the New Orleans side of the river to make an exchange of pilots, that her headway had been stopped, and that she was barely maintaining steerage way. She had sighted the tow when it was about a mile or perhaps a half a mile away, after it came around Algiers Point. The tow at that time was near the center of the river, although somewhat towards the New Orleans side. Lombard, the pilot then in charge of the Rockefeller, blew one blast on his whistle, but received no response. Just about that time the new pilot for the upper river, Neihysel, came aboard and took charge. He was informed that a signal of one blast had been given, and immediately repeated it, but got no

answer. Shortly after that the collision occurred.

"The testimony of Suydeham, first officer of the Falls City, who was in charge, is that when he first saw the Rockefeller she was right ahead, just below Algiers Point, about 40 yards distant. The Rockefeller was keeping to her starboard side. The tow was somewhat towards the New Orleans side of the river, and the pilot of the tow, who was Capt. Mitchell, of the tug Independent, was on the bridge of the Falls City. He gave two blasts of his whistle. Up to that time they had heard nothing from the Rockefeller. The testimony of Mitchell is to the effect that, when he saw the Rockefeller, the Falls City was about 400 feet off the New Orleans shore; that the Rockefeller appeared to be towards the middle of the river and crossing towards the Algiers shore. He blew two long whistles and was answered by one.

"In my opinion the cause of the collision was due to the respective positions of the vessels at that time and the signals given, and the subsequent maneuvers of both vessels are unimportant in considering the question of fault. The pilot rules governing the Mississippi river at this point provide:

"Rule 1: 'When steamers are approaching each other from opposite directions, the signals for passing shall be one short distinct blast of the whistle to alter course to starboard, so as to pass on the port side of the other, and two short and distinct blasts of the whistle to alter course to port, so as to pass on the starboard side of the other. When two steamers are meeting end on, or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass on the port side of the other. When an ascending steamer is approaching a descending steamer, the pilot of the ascending steamer shall give the first signal for passing, which shall be promptly answered by the same signal by the pilot of the descending steamer, if safe to do so, and both shall be governed accordingly; but if the pilot of the descending steamer deems it dangerous to take the side indicated by the ascending steamer, he shall immediately signify that fact by sounding the alarm or danger signal of four or more short and rapid blasts of the whistle, and it shall be the duty of the pilot of the ascending steamer to answer by a signal of four or more short and rapid blasts of the whistle, and the engines of both steamers shall be immediately stopped, and backed if necessary, until the signals for passing are given and answered.'

"The rules also provide that, where possible, the signals for passing must be made, answered, and understood before steamers have arrived at a distance of half a mile of each other. Rule 5 provides, further, that when a steamer is ascending, and running close on a bar or shore, the pilot shall in no case attempt to cross the river when a descending steamer shall be so near that it would be possible for a collision to ensue therefrom.

"On behalf of the tugs it is contended that the custom of the river furnished an exception to the rules, and that the Rockefeller should have been closer to the Algiers side of the river under Algiers Point, while the tow should have run the bend and was properly in her course near the New Orleans side. There is no doubt that it is the custom of the Mississippi river for ascending boats to go up under the points in order to get the benefit of the slack water, while the descending vessel runs the bends, but keeps near the center of the river, in order to take advantage of the current. This exception to the pilot rules is of long standing and has received judicial sanction frequently. However, I do not think it applies to this case. Necessarily, in the harbor of New Orleans, vessels must go close to shore, if contemplating a landing or other legitimate business, such as here disclosed. It also appears that the point of collision was well below Algiers Point in a comparatively straight stretch of river.

"There is conflicting testimony in the record from reputable and experienced mariners as to the usual course taken by ascending and descending steamers, and as to where they should be at the point where the collision occurred. The preponderance of this testimony would put the Rockefeller in the right position, but that, too, is immaterial, in the view I take of the case. There is no doubt the Rockefeller had the right to be where she was. She had gone in as close to the shore as possible in order to exchange pilots. The pilots were exchanged and laundry from the ship was sent ashore. There is also evidence of one witness that the captain's wife was sent ashore. Great stress is laid upon that circumstance, but I do not think it is material, if true. However, it would afford an additional reason, if necessary, for the maneuver of the Rockefeller. It is usual, when vessels debark passengers in small boats, and in this case

it was a small launch, to go as near the shore as possible, both for convenience and safety in making the transfer.

"It was the duty of the Rockefeller to initiate the passing signals under the rules. The testimony of those on her is that she did so. Conceding that the tow did not hear the signals, or conceding that they were really not given, there is no doubt that the tow, the descending vessel, took it upon herself to initiate the passing signals, which she had no right to do. I cannot conceive how it was possible, if those on the .tow were keeping a proper lookout, that they did not see the Rockefeller before they arrived within 400 yards of her. She was a large ship, going up light, and naturally standing well out of the water, with all her lights burning. There is evidence that there was some fog above Algiers Point, and that the weather was a little bit smoky at the time of the collision; but there is also evidence tending to show that it was good navigable weather, and there is evidence from those on the tow that they did see the lights of the Rockefeller before they were close enough to distinguish the ship herself. If the tow was 400 yards distant from the Rockefeller when they observed her at any time before the collision, the tow had the whole width of the river in which to avoid the collision, while the Rockefeller had only 150 feet at most. The preponderance of the evidence shows that she was much closer to the bank than that, say about 100 to 75 feet.

"When the tow observed the Rockefeller only 400 yards away, it was her duty to immediately take steps to avoid the collision. There is no doubt that Capt. Mitchell is mistaken in testifying the Rockefeller was near the center of the river, heading for the Algiers shore. There is not the slightest doubt that she was close onto the New Orleans bank and practically at a standstill. In my opinion the collision occurred solely through the fault of the tow attempting to initiate the passing signals, and in not being near the center of the river, where she should have been, and in not adhering to the rule of the road at sea, to keep to the right, and that there was no fault on the part of the Rockefeller.

"There will be a decree exonerating the Rockefeller from fault for the collision. The primary fault for the collision was with the Independent, as her captain was in complete charge of all three vessels; but as both tugs belong to a common owner, and were engaged in common enterprise, there will be a decree against both of them for damages in favor of the United States."

By amendment to the decree interest was allowed only from August 31, 1923. On consideration of the evidence, we reach the same conclusion as the District Judge, as set forth in his opinion, with the exception that interest should be allowed at 5 per cent. per annum from the 24th day of August, 1921, until payment.

The decree of the District Court is affirmed, except as last indicated on the allowance of interest.