THE DORSET. THE POCAHONTAS. THE CRISFIELD. THE CARFLOAT NO. 18.

(District Court, E. D. Virginia. March 7, 1918.)

COLLISION ⟨⟩102—VESSEL LEAVING SLIP AND PASSING TOW—MUTUAL FAULTS.

A collision occurred in the daytime in Elizabeth river at Lambert's Point between a large steamship backing out from her slip on the east side in charge of the tug Pocahontas, after giving the slip signal and a carfloat in tow of the tug Crisfield on a 600-foot hawser passing down. When a quarter of a mile away the Crisfield gave a signal of two whistles which was answered by the same by the steamship being then halfway out of the slip. The Crisfield proceeded at full speed of 7 miles and

passed safely, but her tow came into collision with the starboard quarter of the steamship. *Held*, that both tugs were in fault for navigating after exchange of signals, without proper regard for the movements of each other, the Crisfield also for using so long a hawser in violation of law and harbor regulations, and the steamship for giving the signal she did and then continuing to back into the stream; the channel being only 600 feet· wide and obstructed by other shipping.

In Admiralty. Suit for collision by Arthur Lloyd Hughes, master of the steamship Dorset, against the steam tugs Crisfield and Pocahontas and the New York, Philadelphia & Norfolk Railroad Company Carfloat No. 18, with cross-libels. Decree holding both tugs in fault.

Kirlin, Woolsey & Hickok, of New York City, and Edward R. Baird, Jr., of Norfolk, Va., for libelant.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., and Hughes & Vandeventer, of Norfolk, Va., for the Pocahontas.

Thomas H. Willcox and Hughes, Little & Seawell, all of Norfolk, Va., for the Crisfield and the Carfloat No. 18.

WADDILL, District Judge. These cases involve a collision between Carfloat No. 18 of the New York, Philadelphia & Norfolk Railroad Company and the steamship Dorset in the Elizabeth river, off Lambert's Point piers, Norfolk, Va., on the morning of January 25, 1917, about 11 o'clock.

The original libel was filed by the Dorset against the Crisfield and carfloat, and also the tug Pocahontas. The owners of the Crisfield and carfloat filed a cross-libel against the Dorset, and a separate libel against the Pocahontas, and the owners of the latter tug, the Lambert's Point Towboat Company, filed its answer to the two libels against it, and in the twelfth paragraph thereof claimed the benefit of the provisions of the act of Congress providing for limitation of liability.

The Dorset, a large ocean-going steamship 460 feet long, 58 feet beam, 31 feet deep, and 7,000 gross tons, was in the slip on the southern side of the northern or steel coal pier at Lambert's Point, and had engaged the services of the Pocahontas to take her from the slip out in the channel. Before making her departure, the appropriate and usual slip signal of one long blast of her whistle was given by the Dorset to indicate her purpose to back out of the slip, which was heard by those in charge of the navigation of the Crisfield, which had the carfloat in tow, coming down the channel some half a mile away. On hearing the slip whistle, the Crisfield sounded two blasts of her whistle, indicating her desire to pass the Dorset on her own starboard side. This signal was not heard by those in charge of the Dorset, and no answer was made thereto; and the Crisfield, a short time thereafter, when something over a quarter of a mile away upstream, again sounded two blasts of her whistle to indicate her purpose to pass on her own starboard side, to which the Dorset, when the Crisfield was about one-quarter of a mile away, and the Dorset about halfway out of the slip, promptly replied with two blasts of her whistle, apparently giving her assent to the Crisfield's so doing. The tug and tow were proceeding at full speed of about 7 miles an hour at the time of giving the signals, and so continued up to the time of the collision. Shortly before it hap-

pened she put her wheel hard astarboard, with a view of going as far to port as the circumstances admitted, having regard to other shipping then present in the harbor immediately in her course, and, upon the tug passing abreast of the Dorset, put her wheel hard aport, to avoid collision with an anchored vessel ahead.

The Dorset was being brought out of the slip under the direction of the officers of the Pocahontas, the latter's master being upon the Dorset's bridge, directing the movement of that ship out of the slip, and the Pocahontas keeping its bow against the starboard bow of the Dorset, to facilitate her movement out of the slip. The Dorset backed out under her starboard engine, until her bow had slightly passed the end of the pier, her stern angling upstream, when she rang up her starboard engine, and shortly thereafter her port engine, and the Pocahontas assisted in shoving her head round into the stream, with a view of straightening out therein.

At the time of the collision the testimony is to the effect that, although the Dorset was well out in the stream, her stern angling upstream, she was still moving slightly backwards, although her engines had been put forward; and it was in this condition that the starboard bow of the carfloat, that had not materially changed its course following the tug, under the latter's movement to port, collided with the starboard quarter of the Dorset, causing the latter serious injury.

The Dorset's contention is that the Crisfield was an overtaking vessel, and her signals so indicated, being given to notify the Dorset of her intention to pass, leaving the Dorset on her starboard; that, being an overtaking vessel, it was her duty to keep out of the way of the Dorset, and to pass her in safety; that the Dorset's reply to her signal simply indicated her acquiescence in the tug's desire, at the latter's own risk, and that the Dorset assumed the Crisfield and its tow had ample room to pass; that her two signals indicated nothing more than this, and there was no occasion for the signals to have been given to the Dorset, save as from an overtaking vessel.

The Crisfield, on the other hand, denies that she was an overtaking vessel, and that the rules applicable to such passing applied. She insists that the vessels were on crossing courses; that she had to pass as she did, by sounding the two whistles, and securing assent thereto of the Dorset; that, assuming it to be an overtaking case, the Dorset ought not to escape liability, since she should not have crowded the course of the Crisfield and her tow; and that her reply of two blasts, to the two of the Crisfield, entirely misled the latter vessel, if it did not indicate that she could pass on her starboard side, as requested, and that the Dorset would direct her navigation to that end.

The court has given much consideration to the testimony, and to the rules of navigation properly governing vessels in their respective situations, and its conclusion is that neither the crossing nor the overtaking rules strictly apply, but, on the contrary, the case was one of a passing vessel colliding with one backing out of a slip (rule 5, art. 18 [Comp. St. 1916, § 7892]), and under principles of maritime law, and particularly the special circumstances and general prudential rules (articles 27 and 29 [Comp. St. 1916, §§ 7901, 7903]), that the two vessels

could and should have so navigated as to avoid collision one with the other, and that both are reprehensible for failure to do so. There was a smooth sea, the tide not running sufficiently strong to materially affect the movements of the vessels, light wind, in broad daylight, and save from the dangers incident to navigation at this point, where the channel curves, and the harbor generally is, and was at the time, crowded with other shipping, there was nothing to cause this collision, save the failure of one or other of the vessels to navigate with the degree of care and prudence required. It is entirely manifest that, if each vessel did just what in effect both admit doing, that is, each pursued the even tenor of its way without paying serious attention to the presence and movements of the other, that they would almost inevitably come together; and this, in the judgment of the court, is precisely what they did, with the result that might reasonably have been anticipated. The down-going tug and tow sought to pass, without materially changing its course, on account of the outcoming ship from the slip, or reducing its speed, and the steamer launched forth backwards from the slip into the main channel in apparent disregard of the rights of the down-going tug and tow.

The Crisfield, having regard to the channel, the deep-water cut being only 600 feet wide, the bend at or near the point of collision, and the presence of shipping on the port side of the channel, some of it swinging out into the channel, must have known that it was at least dangerous to have attempted to pass down at the speed of 7 miles an hour, with a tow of over 1,000 feet long (the tug being over 100 feet, the hawser some 600 feet, and the carfloat 350 long), operated in violation of law and of the harbor rules and regulations; and to have attempted to do so, with this large ship apparently backing across its course, by giving to her passing signals, and receiving what it deemed an assent thereto, with the outcoming vessel in full view, and continuing its movement across the tow's course, was inexcusable. Indeed, she should not have attempted to pass over this course on a hawser of this length at all; the safer, if not the only safe, course being for the Crisfield to have made fast alongside of the carfloat, where it could promptly and effectively have controlled the carfloat's movements, and at least its hawser should have been most materially shortened. Rules and Regulations Board of Harbor Commissioners, § 18; Act Cong. May 28, 1908, c. 212, § 14, 35 Stat. L. 428 (Comp. St. 1916, § 7969), and regulations duly promulgated pursuant to the statute of December 7, 1908; United States v. Transportation Co., 184 U. S. 247, 22 Sup. Ct. 350, 46 L. Ed. 520; The Jamestown, 114 Fed. 596; The Manhattan (D. C.) 181 Fed. 229, 233; The Margaret J. Sanford (D. C.) 203 Fed. 331; The Teaser, 246 Fed. 219, 222, —— C. C. A. ——.

The Dorset, on the other hand, should not be excused from fault under the circumstances of this case. She had notice of the presence of the tug and tow; she was advised of what the latter purposed doing; and she should not have continued backing out into the stream without in some manner recognizing the existing conditions, and certainly she should not have sounded the two blast signal, which misled the other vessel; and if that signal only meant, as claimed by

the Dorset, that she assumed the other vessel would take care of itself, it should not have been given at all, as no such rule was prescribed. On the contrary, danger signals should have been sounded (rule 3, art. 18, Pilot Rules [Comp. St. 1916, § 7892]), or some step taken to indicate lack of understanding of the proposed movements of the Crisfield; and if, as claimed by the Dorset, she deemed the other vessel an overtaking vessel, which the court thinks the facts did not warrant, in that event she should not have crowded the course of the passing vessel (article 18, rule 8), which she necessarily did by continuing to back into and across the stream.

It follows from what has been said that the collision occurred as the result of the joint negligence of the Crisfield and her tow and the tug Pocahontas, and that the losses arising therefrom should be divided between them, and a decree so determining will be entered on presentation.