### THE JOHN D. ROCKEFELLER. THE FALLS CITY.

(District Court, E. D. Virginia, September 30, 1919.)

1. COLLISION ⬥91—VESSELS IN HARBOR—FAULT IN NAVIGATION BY TUGS.
   A collision on the Mississippi river off New Orleans between steamships on meeting courses, but one of which had stopped some 75 feet off the piers, *held* due to fault in the navigation of the other by tugs, which attempted to take her between the stationary vessel and the piers.

2. COLLISION ⬥59—LIABILITY OF VESSEL IN TOW.
   A steamship *held* not liable for a collision which occurred through fault in her navigation when she was being towed by two tugs, the master of one of which was on board her and in full charge and control of her movements, although her engines were running and used as required under his direction.

In Admiralty. Suit for collision by the Standard Oil Company, as owner of the steamship John D. Rockefeller, against the steamship Falls City. Decree for respondent.

Kirlin, Woolsey & Hickok, of New York City, and Edward R. Baird, Jr., of Norfolk, Va., for the John D. Rockefeller.

Hughes, Little & Seawell, of Norfolk, Va., for the Falls City.

WADDILL, District Judge. [1] On the evening of the 15th of November, 1917, about 5:30 o'clock the collision, the subject of this litigation, occurred in the waters of the Mississippi river, at New Orleans, at a point approximately off and slightly below Poland street, and in the vicinity of Pauline street wharf, between two large ocean-going steamships, the John D. Rockefeller, 458.3 feet long, 60 feet beam, and 28.6 feet deep, and the Falls City, 397 feet long, 52 feet beam; the port quarter of the Falls City striking the port bow of the Rockefeller. Each ship was seriously damaged; the owners of the Rockefeller claiming $40,000, and of the Falls City $30,000.

The Rockefeller's case briefly is: That she was a large oil tank steamship, coming up the river light, and on reaching Pauline street wharf, and being about 75 feet out in the channel, she stopped for the purpose of changing pilots, and while lying there, kicking her engines only sufficient to prevent her from being carried down stream by the current, she was run into by the Falls City. That upon observing the Falls City rounding Algiers Point a mile or more away, coming on the opposite side of the river in tow of two tugs, one lashed to her port quarter, and the other to her starboard quarter, her pilot sounded one whistle, indicating his purpose to pass port to port. That, upon the second pilot coming aboard to relieve him, the retiring pilot advised him of the signal he had given and his failure to receive a reply, and the latter promptly sounded a second single blast of the whistle, indicating his desire to pass port to port, to which the Falls City, then some 500 or 600 feet away, responded with two signals, indicating her desire for a starboard passage; that is, to cross the course of the Rockefeller. That the Falls City was aided in her navigation by the tugs using her own power in part, in addition to that of their own. After receiv-

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

ing the two blasts from the Falls City, the Rockefeller promptly gave danger signals, and reversed her engines, and did all possible to avoid the collision, but too late to avert the same.

The Falls City's case is: That she had been at anchor at Westwego, in the port of New Orleans, and had taken on part of her cargo, and desired to shift to a point down the river known as Chalmette oil slip, to complete her loading, and for this purpose her agents at New Orleans employed the Bisso Towboat Company to move the ship, who furnished two large and powerful tugs, the Independent and the Capt. William Bud, to do so. The Independent, the larger of the tugs, was made fast to the starboard quarter of the Falls City, and the Bud to the port quarter, and the master of the Independent took command of the expedition, and directed the movement of the ship and tugs from the bridge of the ship. The ship's master was not on board, and the mate was in command, though he took no part in the navigation of the vessel after the tugs made fast. The movement, thus started down the river, proceeded regularly and without special incident, save that fog was encountered, which seems not to have materially affected her navigation so far as this case is concerned, until after rounding Algiers Point, when the Rockefeller was sighted coming up the river, and two blasts of her whistle were at once given, indicating a desire to pass starboard to starboard. No reply being made to this signal, the same was in a short time, when the vessels were within half a mile apart, repeated, and a reply of one signal was received from the Rockefeller, indicating her purpose to pass port to port; that is, gave the crossing signal. That thereupon the Falls City properly sounded danger signals and reversed her engines, and so continued until, when virtually in collision, and with a view of lightening the lick of the same, she hard-astarboarded, and put her engines full speed ahead, and did everything possible in her power to avert the same, but without avail. That at the time of giving the first signal the Falls City was heading directly down stream, and the Rockefeller was out in the stream some 300 or 400 feet. That she was not at a standstill then, or at the time of the collision, but, on the contrary, was proceeding rapidly at some 10 miles an hour.

The Falls City insists that the Rockefeller was on the wrong side of the river for an ascending vessel; that at bends in the Mississippi river the custom is for the down-coming vessel to run the bend, and the ascending to cut the point, the result being that the ascending vessel would miss the force of the current against it, and go up through the eddy water, while the descending vessel would move with the current.

The facts are less in dispute than is usual in collision cases, and, indeed, save as to just where the two vessels were in the river, and opposite which wharves and the existence or nonexistence of the custom respecting the passing of vessels at bends to the right, according to the narrow channel rules of navigation, there seems to be no serious controversy, and the case turns almost entirely on the correct determination of the law governing the rights of the vessels in collision, under the circumstances. The court thinks the testimony sustains the Rockefeller's contentions respecting the circumstances of the navigation, rather than those of the Falls City. It seems entirely clear that the

Rockefeller was not in the stream where the Falls City contends she was, but that she was approximately where she places herself; that is, much nearer to the shore; and it is manifest that the ship was virtually at a standstill at the time of the collision, and was not proceeding at the speed of 10 miles an hour, as claimed by the other side, or any appreciable speed. It is likewise apparent that the two vessels could not have struck each other as they did, if the Falls City's contention is correct; whereas, what happened could readily have occurred, had their movements been as claimed by the Rockefeller.

As to the existence or nonexistence of the custom respecting the navigation of ascending and descending vessels referred to, there does not appear any sufficient justification for the Falls City's navigation, admitting the existence of the custom, as it was manifestly impracticable for her, particularly with a tug made fast to either side of her, to have gone in between the Rockefeller and the wharves, and vessels made fast thereto, and it was too imprudent, reckless, and dangerous for her to have attempted to do so.

[2] For the purpose of passing upon the legal question determinative of this litigation, the court will assume the facts to be as stated, and that those in charge of, and directing the navigation of, the Falls City, were at fault, and, so considering, will determine whether or not the Falls City is liable to the Rockefeller under the circumstances stated, namely, whether she should be held liable, or the tugs navigating her solely responsible, for the collision.

This litigation is solely between the Rockefeller and the Falls City, and neither of the two tugs nor their owners are before the court. As respects the facts bearing particularly on this feature of the case, viz. the Falls City's navigation, there is no material dispute between the parties. The Falls City was being towed from one place to another in the harbor of New Orleans, for the purpose of loading, having lashed on either side of her stern a large and powerful tug; and while her motive power was in part used in the movement of the ship, she was under the direct command and control of the master of the Independent, who directed the movement and operation of the whole outfit. Red and green running lights were on the ship, and the regular towing lights on each tug, and both tugs seem to have been in all respects seaworthy and suitable, and able to perform the service in hand, and were properly equipped and handled by suitable and competent officers. Indeed, no suggestion is made against the navigators of the tug, save by innuendo as to the captain of the Independent.

The law applicable to and fixing the rights of the parties, upon the statements of facts indicated, seems, so far as the courts of the United States are concerned, too well settled now to admit of serious doubt or cavil, whatever may have been its uncertainty at any earlier time, or how much individuals may doubt as to its wisdom; that is to say, where a vessel, herself free from fault, and not contributing to the collision, is in tow of another, the latter having entire control and direction of the tow's movements, and itself capable and suitable for performing the work in hand, being operated and navigated by competent, skilled, and trusted navigators, and damage arises from the neg-

ligence of the towing vessel, or those having control of her, it is considered and treated as an independent contractor, and solely liable for the injury caused by its negligence and want of care, and the ship in tow is relieved from liability, although the collision may actually be with that vessel.

The Supreme Court of the United States in Sturgis v. Boyer, 24 How. 110, 16 L. Ed. 591, an opinion by Mr. Justice Clifford, declared this to be the law, and that court in a comparatively recent decision in The Eugene F. Moran, 212 U. S. 466, 29 Sup. Ct. 339, 53 L. Ed. 600, adheres to the same doctrine. The Circuit Court of Appeals for this circuit, in the recent cases of The Dorset, 260 Fed. 32, —— C. C. A. —— (but the District Court opinion is found in 250 Fed. 867), and in the case of The Cromwell, 259 Fed. 166, —— C. C. A. —— (the District Court opinion is found in 247 Fed. 207), strictly followed that doctrine. In the case of the Cromwell, Judge Woods, speaking for the Circuit Court of Appeals of this circuit, said:

> "The owners of the tug having thus entered into an independent contract of towing, the tug alone would be responsible for negligence in the undertaking, unless officers of the Cromwell retained some control of the ship and were guilty of some negligence. It is true her master and crew were on the Cromwell carrying out the orders of Sanders, but they did nothing more; and in that relation they were mere instrumentalities or means used by Sanders to apply the wheel, engine, and other instruments of navigation—not participants in the navigation. Hence it seems evident that, if the injury to the bridge was due to negligence, it was that of the towing company, owner of the tug, as an independent contractor, for which the Cromwell was not responsible. Sturgis v. Boyer et al., 24 How. 110, 16 L. Ed. 591; The Eugene F. Moran, 212 U. S. 466, 29 Sup. Ct. 339, 53 L. Ed. 600.

In the Cromwell Case an able, comprehensive review of the authorities generally will be found in the opinion of Judge Conner in the District Court, 247 Fed. at pages 214 to 218, inclusive. See, also, Hughes, Adm. §§ 55, 58, and 59, where the same question is discussed and authorities cited.

Counsel for the Rockefeller insist that the Falls City should be held responsible, because her own power was used, when necessary, as auxiliary to that of the tugs in making her movements. This position is not well taken, as an examination of the authorities will show that that fact is immaterial, where the vessel was free from fault, does nothing to contribute to the disaster, and is in tow of and under the control and direction of a tug, staunch and seaworthy, and suitable for the service, and in command of skilled, competent, and trusted navigators.

Counsel moreover, invoke the doctrine applicable to the liability of ships for negligence of pilots, and urge that the captain of the tug Independent was but a pilot. The law is well settled that vessels are liable for the negligent acts of pilots as between themselves and strangers; but in this case that fact should not affect the Falls City prejudicially, since it is manifest from the whole testimony that she was in tow of two tugs, under regular contract for hire, and was in command of, and her movements controlled by direction of the master of the tug Independent, in his capacity as the tug's master, as distinguished

from a pilot in the technical acceptation of that designation. The Cromwell, supra.

The conclusion of the court is that at the time of the collision in question the Falls City was entirely under the control of the tugs navigating her, and subject to the order and direction of the chief tug master; that both tugs were seaworthy and entirely capable of performing the service in hand, and were under the command of competent navigators; and that she was guilty of no negligence for which she should be held liable under the law.

It follows that a decree may be entered, dismissing the libel, at the cost of the libelant.