The **PEOPLE OF THE STATE OF CAL-IFORNIA**, Libelant,

v.

**THE** Steamship **JULES FRIBOURG** et al., Respondents,

and

States Marine Corporation of Delaware, a corporation, Respondent Impleaded.

No. 26612.

United States District Court
N. D. California, S. D.
March 29, 1956.

Edmund G. Brown, Atty. Gen. of California, Miriam E. Wolff, Deputy Atty. Gen., for libelant.

Carter Quinby, James A. Quinby, Derby, Cook, Quinby & Tweedt, San Francisco, Cal., for respondent, cross-respondent and cross-libelant, Arrow S. S. Co.

Graham, James & Rolph, San Francisco, Cal., for impleaded respondent States Marine Corp. of Delaware.

Lillick, Geary, Olson, Adams & Charles, San Francisco, Cal., for respondent, cross-respondent and cross-libelant, Shipowners & Merchants Towboat Co., Ltd., and respondent and cross-respondent, Robert E. Markley.

GOODMAN, District Judge.

These libels and cross-libels stem from the ramming of pier 41 at the Port of San Francisco by the S. S. Jules Fribourg when she attempted to dock there on December 30, 1952. Pier 41 is owned by the State of California. At that time the Jules Fribourg was owned by Arrow Steamship Co. and was under time charter to States Marine Corporation of Delaware. The charter provided that Arrow Steamship Co. should remain responsible for the navigation of the vessel, but that States Marine Corp. should provide and pay for all pilotages. In accordance with this provision, States Marine Corporation engaged Shipowners & Merchants Towboat Co., to move the Jules Fribourg from her berth at Richmond and dock her at pier 41 in San Francisco. Shipowners & Merchants Towboat Co. dispatched the tug Sea Lark to assist in this movement and the tug captain, Robert Markley, boarded the Jules Fribourg to act as pilot. When the Jules Fribourg rammed pier 41 she was being handled by her own crew and was proceeding under her own power assisted by the tug. Captain Markley was on the bridge of the Jules Fribourg directing the movements of both vessels.

The State of California, seeking recovery for damage to the pier, filed libels in rem against the Jules Fribourg and the tug Sea Lark, and libels in personam naming as respondents Arrow Steamship Co., Shipowners & Merchants Towboat Co., Captain Markley, and the Red Stack Pilots' Association to which Captain Markley belonged. Arrow Steamship Co. filed a cross-libel in personam against Shipowners & Merchants Towboat Co., Captain Markley and Red Stack Pilots' Association for the damage to the Jules Fribourg and for indemnity for any amount for which it might be held liable to the State of California. Shipowners & Merchants

Towboat Co., seeking indemnity for any damages which might be assessed against it, filed a cross-libel in rem against the Jules Fribourg and in personam against Arrow Steamship Co., and impleaded as a respondent States Marine Corporation. In rem jurisdiction of the Jules Fribourg and the tug Sea Lark was never obtained. Red Stack Pilots' Association was dismissed as a respondent. The issues which must now be determined are: Whose fault, if any, was the cause of the mishap, and which of the remaining respondents must bear the ultimate liability for the damage to the Jules Fribourg and to the pier.

██ Since there is no substantial evidentiary conflict, the issue of fault becomes primarily a legal one. There is no evidence of any fault on the part of either the crew of the Jules Fribourg or the crew of the tug. Both crews responded promptly to all orders of Captain Markley. Captain Markley admitted that the ramming of the pier resulted solely from the fact that he underestimated the strength of the tide. He testified that, had he accurately judged the strength of the tide, he would have conducted the docking operation in the same manner except that he would have ordered a second tug to assist in lifting the stern of the Jules Fribourg up against the tide. It is his contention that he was guilty of a mere error of judgment, not amounting to legal fault. It may be true that a pilot, however skillful and diligent, cannot be expected to judge the strength of the tide with complete accuracy. But, Captain Markley must have been aware that the tide was sufficiently strong that a second tug might be needed even though he was reasonably confident that one would suffice. Under these circumstances a prudent pilot would have had a second tug standing by. Captain

Snyder, master of the Jules Fribourg, although unfamiliar with the waters, suggested to Captain Markley that it might be advisable to order a second tug. Captain Markley chose to proceed without it. In so doing, in my opinion, he was negligent.

██ Captain Markley's negligence, of course, subjects him to personal liability. The primary issue in respect to liability is whether his negligence is imputable upon principles of respondeat superior either to the charterer or the owner of the Jules Fribourg or to the tug company. There is no basis for imputing his negligence to the charterer. It is well settled that when a time charter imposes responsibility for navigation upon the vessel owner but requires the charterer to provide and pay for pilotages, the charterer acts on behalf of the owner in engaging a pilot. The owner remains responsible for navigation while the pilot is aboard,[1] and if the pilot hired is an independent one, he becomes the servant of the owner, not the charterer.[2]

A more difficult problem is whether Captain Markley's negligence should be imputed to the owner of the Jules Fribourg or to the tug company. This problem is complicated by the fact that one of the terms of the contract of hire between the charterer and the tug company was a so-called pilotage clause which provides that a tug captain who boards a vessel to act as pilot shall be deemed the servant of the vessel owner in respect to the giving of orders to assisting tugs or in respect to the handling of the vessel.

██ It is not disputed that Captain Markley was in the general employ of the tug company as a tug captain on a full-time basis. He received a fixed monthly salary from which no deductions were made for the time he spent

1. The West Eldara, 2 Cir., 1939, 104 F. 2d 670, modifying 2 Cir., 1939, 101 F.2d 45; The Volund, 2 Cir., 1910, 181 F. 643; The Niels R. Finsen, D.C.S.D.N.Y.

1931, 52 F.2d 795; The Leader, D.C. S.D.N.Y.1908, 166 F. 139.

2. Bramble v. Culmer, 4 Cir., 1897, 78 F. 497.

acting as a pilot. He was at all times while on duty subject to the rules and the discipline of the tug company. His assignments as pilot were made by the company. Certainly it was advantageous for the tug company that its tugs should be directed by a pilot familiar with the tugs and their crews. As well it enhanced the value of the tug company's service to be able to assure vessels a qualified pilot along with its tugs. It is obvious that Captain Markley's status as a pilot was an essential element of his employment as a tug captain, and that it was contemplated that he should act as pilot whenever the tug company required. He was selected to pilot the Jules Fribourg solely by the tug company, and not as a result of any specific request for his services by the charterer. It is true that the tug company did not supervise the manner in which Captain Markley piloted a vessel, but neither did anyone else. The nature of a pilot's duties is incompatible with that type of supervision. It is the general control over a pilot's conduct and his assignments that is significant in determining his status as an employee.

Nevertheless, the tug company disclaims the existence of any employer-employee relationship during the time Captain Markley actually acted as pilot aboard the Jules Fribourg. It is contended that Captain Markley performed the function of piloting the Jules Fribourg entirely independently of his duties as tug captain, and was in effect loaned to the owners of the Jules Fribourg for this purpose. Two factors are relied upon in support of this contention. One is the pilotage clause in the tug company's contract of hire providing that a tug captain while on board a vessel as pilot shall be "deemed" the servant of the vessel owner. The other

is the fact that in addition to the charge made by the tug company for the use of its tug, a separate pilot's fee of $5 was charged for Captain Markley's services by a pilots' association to which he belonged.

The pilotage clause, of course, has no contractual significance in determining the tug company's responsibility to persons not a party to the contract of hire. The rights of such third parties against the tug company depend upon whether or not the company in fact exercised the control of an employer over Captain Markley's pilotage activities.[3] The pilotage clause is relevant in this connection only in so far as it is indicative of an intention on the part of the tug company to relinquish such control. The language of the clause is not expressive of such intention. The word "deemed" connotes a supposition that something is true which in fact is not. Moreover, any inference of such intention which might be gleaned from the clause is overcome by the extent of the control which the tug company in fact exercised over Captain Markley's activities as a pilot.

The collection by the Red Stack Pilots' Association of a separate fee of $5 for Captain Markley's services as pilot does not warrant the conclusion that such service was performed independently of the service performed by the tug company. Membership in the Red Stack Pilots' Association was limited to pilots employed by the tug company. The Port Captain for the tug company was charged with the duty of managing the affairs of the Association. The pilot's fee charged by the Association was a mere token fee not in any way commensurate with the pilotage service actually performed by Captain Markley.[4]

3. For cases discussing the effect of a pilotage clause, similar to the present one, upon the rights of third parties see: Publicker Industries v. Tugboat Neptune Co., 3 Cir., 1948, 171 F.2d 48; Robins Dry Dock & Repair Co. v. Naviga- zione Libera Triestina, S.A., 261 N.Y. 455, 185 N.E. 698, 1933 A.M.C. 700.

4. Compare the situations in The Edward G. Murray, 2 Cir., 1922, 278 F. 895 and in The Caspian, D.C.E D.Pa.1925, 14 F.

The conclusion is inescapable that Captain Markley performed the function of pilot, as well as the function of tug captain, as an employee of the tug company. His duties in both capacities were intermingled, at times concurrent, and all part of the same general employment. It follows that his negligence is imputable to the tug company and that it is liable for the damages of any persons not contractually bound by the pilotage clause. It also follows that his negligence is not directly imputable to the owner of the Jules Fribourg.

But, there remains the question whether the tug company itself acted as the agent of the owner of the Jules Fribourg in docking the vessel. If so, the owner of the Jules Fribourg is accountable for the negligence of the tug company while acting as agent. This question is answered by a substantial line of authorities uniformly holding that when a tug company is hired to dock a vessel, it does so, not as agent for the vessel owner, but as an independent contractor.[5] This is true even though the vessel makes use of her own motive power and has her own crew aboard.[6] The owner of the Jules Fribourg is therefore not liable for the negligence of the tug company on principles of agency. The Jules Fribourg,

itself, may be liable in rem for the damage it caused as a result of Captain Markley's negligence.[7] But, no in personam liability attaches to her owner.

The only other possible basis for liability on the part of the owner of the Jules Fribourg is a contractual one resting on the pilotage clause. The tug company contends that the clause imposes on the owner of the Jules Fribourg the liability to indemnify it for any damages it may be required to pay as a result of the pilot's negligence. Also, the clause might be interpreted as subjecting the owner of the Jules Fribourg to direct liability to the pier owner as a third-party beneficiary of the contract.[8] The owner of the Jules Fribourg urges that the only possible effect of the clause is to relieve the tug company from liability for any damage to the vessel. But, it is unnecessary to reach these questions. For, it appears that under the circumstances of this case, the pilotage clause is a nullity for two reasons.

The first is that the owner of the Jules Fribourg is not contractually bound by the clause. The hiring of the tug company to shift the Jules Fribourg from Richmond to the San Francisco pier was done by her charterer. It is true that in providing a pilot, the charterer acted in behalf of

2d 1006 when the fact that a tug captain had been paid a separate pilot's fee of $5 as a gratuity was held not to justify the conclusion that he performed his services as a pilot independently of his duties as an employee of the tug company.

5. The Cromwell, 4 Cir., 1919, 259 F. 166, affirming D.C.E.D.N.C.1917, 247 F. 207; The Dorset, 4 Cir.1919, 260 F. 32, affirming D.C.E.D.Va.1918, 250 F. 867; The John D. Rockefeller, 4 Cir., 1921, 272 F. 67, affirming D.C.E.D.Va.1919, 260 F. 982; The Niels R. Finsen, D.C.S.D.N.Y.1931, 52 F.2d 795; Robins Dry Dock & Repair Co. v. Navigazione Libera Triestina, S.A., 261 N.Y. 455, 185 N.E. 698, 1933 A.M.C. 700; The West Eldara, 2 Cir., 1939, 104 F.2d 670; Publicker Industries, Inc., v. Tugboat Neptune Co., 3 Cir., 171 F.2d 48; Gyp-

sum Queen—Tug Peerless, D.C.E.D.Va., 1953 A.M.C. 2071. See also the discussion of this point in the dissenting opinion in Logue Stevedoring Corp. v. The Dalzellance, 2 Cir., 1952, 198 F.2d 369, 373.

6. Cases cited note 5.

7. See Logue Stevedoring Corp. v. The Dalzellance, 2 Cir., 1952, 198 F.2d 369; The Maren Lee, 2 Cir., 1922, 278 F. 918; The Niels R. Finsen, D.C.S.D.N.Y.1931, 52 F.2d 795. But cf. The Cromwell, 4 Cir., 1919, 259 F. 166 and The John D. Rockefeller, 4 Cir., 1921, 272 F. 67.

8. See the discussion of the interpretation of the release-from-liability clause in the concurring and dissenting opinions in Boston Metals Co. v. The Winding Gulf, 1955, 349 U.S. 122, 125–128, 75 S.Ct. 649, 99 L.Ed. 933.

340

the owner, since the charter imposed upon the owner the responsibility for navigation. Had the charterer provided for the pilotage of the Jules Fribourg by hiring an independent pilot, he would have become the servant of her owner, not the charterer.[9] But, the charterer in dealing with the tug company did not act as the owner's agent.[10] The charterer had the authority to provide for pilotage, but whatever undertaking it entered into in doing so was its own responsibility. It is not reasonable to imply from the charterer's authority to provide a pilot, the incidental authority either to waive any rights of the owner or to subject the owner to an employer's responsibility for the actions of a person who in fact was controlled by and owed primary allegiance to another employer. The implication of such authority would not be justified even if, as the tug company contends, the owner of the Jules Fribourg was aware that pilotage clauses such as the present one were in frequent use.

The second reason for the inapplicability of the pilotage clause is that it does not in terms embrace the negligent act of Captain Markley. Being a release-from-liability clause it should be given no broader interpretation than its language clearly requires.[11] The clause states that a tug captain acting as pilot aboard a vessel shall be deemed the servant of the vessel owner "in respect to the giving of orders to" any assisting tugs and "in respect to the handling of such vessel," and the tug company shall not be responsible for any damages resulting therefrom. Captain Markley was not negligent in respect to any order given the assisting tug nor in respect to the handling of the Jules Fribourg. His sole act of negligence was his failure to order a second tug for use in case of need. In a broad sense the failure to order a second tug might be said to constitute neglect in the handling of the Jules Fribourg. But narrowly construed, the term "handling of such vessel" can mean no more than the directing of the movements of the vessel itself.

In view of these conclusions with respect to the pilotage clause it cannot be effective either to relieve the tug company from liability or to impose liability on the owner of the Jules Fribourg.

There remains for consideration the contention of the tug company that the charterer of the Jules Fribourg, having failed to disclose that it was not the vessel owner and lacked authority to bind the owner, must be held liable to the tug company either as if it were owner, or for breach of an implied warranty that it had authority to bind the owner. This contention is rendered moot by the conclusion that the pilotage clause did not cover the negligent act of Captain Markley. But, apart from this, it has no merit. The charterer did not enter into any formal written contract with the tug company. It merely made a telephonic request that the tug company move the Jules Fribourg from her dock at Richmond and dock her at pier 41 in San Francisco. The pilotage clause was not discussed at the time, nor did the tug company inquire as to the status of the charterer in relation to the vessel. The pilotage clause can be considered a part of the contract of hire only because the charterer had previously been informed by letter and through prior dealings that it was one of the conditions under which the tug company undertook to render service. Under these circum-

9. Note 2, supra.

10. See The West Eldara, 2 Cir., 1939, 104 F.2d 670, modifying 2 Cir., 1939, 101 F. 45, and The Neils R. Finsen, D.C.S.D. N.Y.1931, 52 F.2d 795, where the court so held in construing a similar time charter.

11. See concurring opinion of Justice Frankfurter in Boston Metals Co. v. The Winding Gulf, 1955, 349 U.S. 122, 123, 75 S.Ct. 649, 99 L.Ed. 933.

stances the tug company was not justified in assuming without any inquiry whatever that the charterer was the owner of the Jules Fribourg, or if not, was authorized to bind the owner to the pilotage clause. Nor would it be reasonable to hold that the charterer in ordering the service had the duty to consider the legal effect of a pilotage clause which was not even mentioned at the time and inform the tug company of any facts which the charterer might deem relevant.[12]

Upon the presentation of findings pursuant to the Rules, final decree shall enter as follows:

(1) Dismissing the amended libel of the State of California as to Arrow Steamship Co., and impleaded respondent States Marine Corporation of Delaware.

(2) Dismissing the cross-libel of Shipowners & Merchants Towboat Co. against Arrow Steamship Co.

(3) Dismissing the petition of Shipowners & Merchants Towboat impleading respondent States Marine Corporation of Delaware.

(4) Dismissing the amended cross-libel of Arrow Steamship Co. as to impleaded respondent States Marine Corporation of Delaware.

And an interlocutory decree shall enter as follows:

(1) In favor of the State of California on its amended libel against Shipowners & Merchants Towboat Company and Robert E. Markley, the amount of damages to be determined by stipulation or upon further hearing.

(2) In favor of Arrow Steamship Company on count one of its amended cross-libel against Shipowners & Merchants Towboat Company and Robert E. Markley, and dismissing count two, the amount of damages to be determined by stipulation or upon further hearing.

12. Compare The West Eldara, 2 Cir., 1939, 104 F.2d 670, modifying 2 Cir., 1939, 101 F.2d 45, where the court reached the same conclusion upon similar facts.