TRANSPACIFIC CARRIERS CORPORATION, as Owner of the M/V HELLENIC SPIRIT, Libellant,

v.

TUG ELLEN F. McALLISTER, her engines, etc. and McAllister Brothers, Inc., Respondent,

McAllister Brothers, Inc., Respondent-Claimant.

United States District Court
S. D. New York.
Oct. 19, 1962.

---

Dow & Stonebridge, New York City, for libellant; William P. Hepburn, New York City, of counsel.

Foley & Martin, New York City, for respondent and respondent-claimant; Christopher E. Heckman, Stephen J. Buckley, New York City, of counsel.

LEVET, District Judge.

This libel of Transpacific Carriers Corporation, as owner of the M/V Hellenic Spirit seeks recovery against the tug boat Ellen F. McAllister (hereinafter "tug McAllister") and McAllister Brothers, Inc. (hereinafter "McAllister"), owner, for damages to the said Hellenic Spirit upon a claim that on December 3, 1958, in the course of towing by the tug McAllister, the Hellenic Spirit was caused to collide with Pier 44, Brooklyn, New York, causing hull damage to the said ship.

Although this case was not formally consolidated for trial with two companion cases of similar nature involving the same parties (60 Ad. 50 and 60 Ad. 278), by stipulation the proof as to the existence of the pilotage clause hereinafter mentioned (Findings Nos. 12 through 19) was taken together for all three cases.

The proposed findings of fact, conclusions of law and briefs of the parties having been received, the court, after considering the pleadings, evidence, exhibits, briefs and stipulations of the parties now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

## FINDINGS OF FACT

1. At all the times hereinafter mentioned the libellant, Transpacific Carriers Corporation (hereinafter "Transpacific") was, and now is, a foreign corporation, organized and existing under the laws of the Republic of Panama and it was and still is the owner of the M/V Hellenic Spirit. Hellenic Lines Inc. was operating the vessel for the account of Transpacific (SM 46, March 19, 1962).

2. (a) At all the times hereinafter mentioned the respondent, McAllister, was a corporation, organized and existing under and by virtue of the laws of the State of New York, engaged in the performance of towage services for hire, and was and now is the owner of the tug McAllister (admitted in pleadings).

(b) The tug McAllister at all times hereinafter mentioned and at the time of the institution of this suit was within the

jurisdiction of this court and was owned and operated by the respondent McAllister (admitted in pleadings).

3. On December 3, 1958, Hellenic Lines' port captain, Angelo Tsaganeas, called McAllister's dispatcher a few hours before the Hellenic Spirit arrived at Ambrose Light (SM 9, March 19, 1962). He gave the dispatcher the length and specifications of the Hellenic Spirit and stated that the vessel was heavily loaded. He requested docking at Pier 44, Brooklyn (SM 10, March 19, 1962). He did not request any specific number of tugs as he generally left this to the discretion of McAllister (SM 11–12, March 19, 1962). Tsaganeas did request the McAllister dispatcher to ask the Sandy Hook pilot, an independent pilot not associated with McAllister, to "have the ship off the pier in slack water" (SM 12–14, 35, March 19, 1962). These instructions were given because there was not any work scheduled for the vessel that afternoon (SM 12–13, March 19, 1962).

4. The tug McAllister, rated at 1,000 horsepower (SM 93, March 19, 1962) was dispatched to assist in the docking of the Hellenic Spirit at Pier 44, Brooklyn. The captain of the tug McAllister, Edward S. Fitzgerald, was to act as pilot in the docking operation. Fitzgerald has been a pilot for the past thirty years, holding a full pilot's license to the New York Port since 1923 (SM 85, March 19, 1962). Prior to December 3, 1958 he had never docked the Hellenic Spirit at Pier 44, Brooklyn, but had docked ships similar to her at that pier. He testified he was familiar with the area (SM 86, March 19, 1962).

5. Fitzgerald boarded the Hellenic Spirit as the vessel passed Buoy 30 near the entrance to Buttermilk Channel and took command between Buoys 9 and 11 (SM 87–88, March 19, 1962; Res. Ex. C). On the bridge of the Hellenic Spirit were, in addition to Fitzgerald, the master of the vessel Captain Stoforos, the Sandy Hook pilot, the third officer and a quartermaster (SM 88, March 19, 1962; Lib. Ex. 1, p. 6).

6. The Hellenic Spirit was to be docked at her berth, port side to the south side of Pier 44. The docking commenced at about 1:00 P.M., during the last half hour of flood tide, some thirty minutes before slack water. Slack water, the time between the end of the flood tide and the beginning of ebb tide, lasted approximately two to seven minutes. The Hellenic Spirit was to use her own engines in the docking operation and was to be assisted by the tug McAllister (SM 88–89, March 19, 1962). Fitzgerald was familiar with the tug McAllister, having been its captain for two years when not acting as pilot (SM 89–90, March 19, 1962).

7. The master of the Hellenic Spirit, Captain Stoforos, suggested to the pilot Fitzgerald that it would be better to get another tug because the berth was very narrow and the ship heavily loaded. After being told that another tug was not available, the pilot stated that he would "try to get the ship alongside." The master had no further objection (Lib. Ex. 1, pp. 5–6) and the pilot did not further discuss his plans of docking the vessel (SM 97, March 19, 1962). Stoforos had nothing to do with the ordering or hiring of the tug boat (Lib. Ex. 1, pp. 8–9).

8. The pilot Fitzgerald originally planned to berth the Hellenic Spirit by placing her in the clear space between the two piers and then turning her about (SM 94–95, March 19, 1962). After beginning the maneuver he discovered that the strength of the tide was stronger than he had originally calculated, running a half to three-quarters of a knot in velocity (SM 93, 97–98, March 19, 1962). Seeing that he was unable to hold the vessel, the pilot discontinued the docking as originally planned and began to back the vessel into the channel to begin the docking anew (SM 97–99, March 19, 1962).

Having pulled clear of the pier, he decided to put the ship against the south

corner of the pier and pivot her into the berth. However, because of the strength of the tide, he did not land the vessel properly and the Hellenic Spirit ended broad side to the off-shore end of the pier with the current setting the vessel onto a pile on the north corner (SM 97–98, 100, March 19, 1962; Resp. Ex. 1 annexed to Lib. Ex. 1; Lib. Ex. 1, p. 28). This contact with the pier resulted in damage to the Hellenic Spirit on the port side near the refrigerator space above the No. 3 hold just forward of the bridge (SM 28–29, 96, March 19, 1962). There was no protest from the master of the Hellenic Spirit at the time of the maneuvers.

9. Although the pilot testified that the tug McAllister constituted sufficient tug power to accomplish this maneuver (SM 91, March 19, 1962), the master Stoforos testified that a second tug would have prevented the vessel from landing broadside on the front face of the pier (Lib. Ex. 1, p. 28).

The translation of the rough log (Lib. Ex. 8), the original in Greek being in the handwriting of Stoforos, states in effect that the tug McAllister was unable to maneuver the ship effectively, "his [Fitzgerald's] excuse being that one tugboat was not enough in view of the fact that the current was carrying the ship with it." However, when Stoforos wrote up the smooth log as translated (Res. Ex. AB), although he conceded that only the unimportant details were omitted, he did not mention the matter of a second tug.

10. Both the tug McAllister and the Hellenic Spirit promptly and properly carried out every order of the pilot Fitzgerald and were not negligent in any respect (SM 89, 93–94, March 19, 1962).

11. From these facts I find that the pilot Fitzgerald was negligent in not having sufficient tug power available in the present state of the tide to properly dock the Hellenic Spirit. The damage to the vessel was the proximate result of this negligence.

12. The services rendered by the tug McAllister on December 3, 1958 in docking the Hellenic Spirit at Pier 44, Brooklyn, New York, were pursuant to a contract entered into between libellant and respondent. This contract was subject to the following pilotage clause:

"Pilotage.

"When the captain of any tug furnished to or engaged in the service of assisting a vessel which is making use of her own propelling power, goes on board such vessel, or any other licensed pilot goes on board such vessel, it is understood and agreed that such tugboat captain or licensed pilot becomes the servant of the owner of the vessel assisted in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting service and in respect to the handling of such vessel, and neither those furnishing the tugs and/or pilot nor the tugs, their owners, agents, charterers, operators or managers shall be liable for any damage resulting therefrom."

13. The testimony of Gerard McAllister, vice president of McAllister and member of the New York and Federal Bars, and respondent's exhibits, sustain the foregoing finding (No. 12):

At the time of the original agreement (see Res. Ex. D, December 4, 1951 for New York and Res. Ex. E for Norfolk, dated July 12, 1951), the pilotage clause was not discussed (McAllister SM 3–4); the only time it was discussed was in late 1957 or early 1958, at which occasion Mr. Callimanopulos, general manager of Hellenic Lines (SM 44, March 19, 1962), said he did not like it and Mr. McAllister said: "I am sorry but it is a part of the contract." (Id. at 16–17) Mr. McAllister never agreed to alter or remove the pilotage clause (Id. at 18, 40).

The initial contracts, Res. Ex. D, dated December 4, 1951 and Res. Ex. E, dated July 12, 1951, were "upon the terms and conditions as stated." (McAllister

SM 6) The respondent, from time to time subsequent to the initial contracts, sent libellant the rate schedules first referred to "in the terms and conditions" and which contained the pilotage clause (see Res. Ex. F, effective December 15, 1950; Res. Ex. K, effective May 15, 1951 (Norfolk, Virginia); Res. Ex. G, effective April 20, 1953; Res. Ex. H, effective April 1, 1955; Res. Ex. J, effective April 16, 1957; letter, Res. Ex. I, March 15, 1957; McAllister SM 6–10, March 20, 1962).

14. Towage service slips were regularly signed by the master of the Hellenic Spirit and other Hellenic ships when the pilot completed his work; such slips contained the aforesaid pilotage clause (Res. Ex. L, dated December 3, 1958; Res. Ex. N, dated July 31, 1958; McAllister, SM 10–13).

15. With the respective invoices sent to libellant by respondent were the related pilot receipts such as Res. Ex. L and Res. Ex. N (see invoices, Res. Ex. B, dated August 28, 1958; Ex. M, dated December 11, 1958 covering services on December 3, 1958; Ex. O, dated August 5, 1958, covering services of July 31, 1958). Hellenic Lines, apparently by the port captain, checked these bills, knowing that the pilotage clause was printed on the foot of the bills (SM 38–40, March 19, 1962; McAllister SM 11–15, March 20, 1962).

16. The proof adduced by libellant does not sustain its contention that the pilotage clause was not effective. Mr. Callimanopulos testified that he asked Gerard McAllister for, and received, a special 7½% discount on towage (SM 50, 51, March 19, 1962), which was to be paid to Hellenic's subsidiary, Fenton Steamship Company (SM 52, March 19, 1962).

Before the damage to the first ship (SM 54, 55, March 19, 1962) Callimanopulos testified that he demanded, and Mr. McAllister accepted, a condition that respondent would be responsible for any damage to Hellenic's ships while in McAllister's custody (SM 55, 56, March 19, 1962).

However, when libellant was sued by respondent for towage, Callimanopulos in substance testified on September 15, 1960 that when he asked McAllister to be responsible for any damage to ships (i. e., eliminate the pilotage clause), Mr. McAllister objected, said it was a hard task for them because that would involve an increase in their insurance premiums and, finally, he said that he (Mr. McAllister) would give his best consideration for any case that would arise, and, as a matter of fact, this has been the case (SM 69, 70, March 19, 1962).

When called in rebuttal, Callimanopulos said his discussion with Mr. McAllister about the pilotage clause had taken place when the contract was negotiated *or* when "we had the first accident" (SM 49, March 20, 1962) and he again stated merely that Mr. McAllister said "he would consider favorably each case." (SM 51, March 20, 1962)

In any event, it is my opinion that the correct version of these conversations is that given by Mr. McAllister in Finding No. 13, and I so find.

17. Other testimony supports respondent's claim as to the pilotage clause. Any claims settled by respondent were by consent. In some cases, third parties who were not bound by the pilotage clause were involved. The respondent took pains to state that the settlements were without prejudice to the respondent's rights under the pilotage clause. Many settlements were on a 50% basis (McAllister, SM 17–31, March 19, 1962).

In November 1956 the libellant lodged a pier damage claim to Pier Cluster, Pier 2, Brooklyn (Res. Exs. R and S), submitting an estimate of $2,357 (Res. Ex. S). On June 5, 1957 the respondent denied liability and asserted the pilotage clause (Res. Ex. T).

On March 11, 1958, the libellant lodged a claim for damage to the Smith Street Bulkhead, Brooklyn (Res. Ex. U) and later requested $1,375 in settlement (Res.

Ex. V). The respondent again asserted the pilotage clause by letter (Res. Ex. W).

On August 12, 1958, a claim was made by libellant for respondent's alleged damage to Pier 16, Brooklyn (Res. Ex. P). In answer, McAllister asserted the pilot-age clause in its letter of September 5, 1958 (Res. Ex. Q).

18. Subsequently, after certain negotiations during which towage claim payments due to McAllister by Hellenic were held up, certain partial settlements were made, as follows (Res. Ex. X):

| | Vessel | Date | Claim | Settlement |
|---|---|---|---|---|
| 1. | Hellenic Glory | 10/30/56, Pier 2, Brooklyn | $2,357.00 | $1,178.50 |
| 2. | Hollandia | 11/13/57, Smith St., Brooklyn | $1,375.55 | $ 715.00 |
| 3. | Hellenic Glory | 7/16/58, Pier 16, Brooklyn | $1,132.80 | $ 566.40 |
| 4. | Hellenic Spirit | 2/27/58, Pier S, Norfolk | $6,150.00 | $2,000.00 |

In the same letter, Res. Ex. X, dated November 10, 1958, McAllister wrote:

"These settlements are being offered to you without prejudice to our position concerning the pilotage clause.

" * * * we trust that you will give this your favorable consideration, and further that you will see your way clear to releasing the long overdue payments in connection with our various towage bills rendered you."

19. It appears that Hellenic Lines Ltd. was at times attempting to hold back payment of towing damages in order to secure settlements from McAllister (See Lib. Ex. 15; Res. Exs. Y, Z; McAllister, SM 27–28, March 20, 1962).

20. I find that the foregoing acts or failure to act on the part of the pilot were not within the protective or exculpatory terms of the aforesaid pilotage clause.

## DISCUSSION

The conclusion from these facts seems inescapable that the pilot Fitzgerald failed to properly assess the strength of the tide vis-a-vis the power of the tug. After having begun his original maneuver, he discovered that the strength of the tide was forcing the vessel towards the pier. He then decided to alter his plan and to berth the ship by pivoting her about the south corner of the pier. The damage to the vessel resulted when the tide forced the entire port side of the vessel against the off-shore end of the pier.

It can hardly be gainsaid that the pilot must know the capacity of his tug in the then-existing state of wind and water. The Charles B. Sandford, 2 Cir., 1913, 204 F. 77; The E. T. Williams, 2 Cir., 1905, 139 F. 231; Penn. Ry. Co. v. The S. S. Beatrice, D.C.S.D.N.Y. 1958, 161 F.Supp. 136, aff'd 2 Cir., 1960, 275 F.2d 209; The J. S. T. Stranahan, D.C.S.D.N.Y.1907, 151 F. 364, aff'd 2 Cir., 1908, 165 F. 439.

"Misjudgment by a pilot, who is, or under the circumstances ought to be, aware of dangers and who then decides to take the chance, constitutes negligence. Holcomb v. The Adam E. Cornelius, 7 Cir., 1954, 212 F.2d 719; The Morristown, 2 Cir., 1925, 9 F.2d 391. * * *" Pennsylvania Ry. Co. v. The S.S. Beatrice, supra 161 F.Supp. at 145.

The issue then becomes whether this negligence of the pilot falls within the terms of the pilotage clause.

"The pilotage clause must, of course, be strictly construed against the towing company and should be given no broader interpretation than its language clearly requires. See The People of the State of California v. The Jules Fribourg, D.C.N.D.Cal. 1956, 140 F.Supp. 333, 340; National Distillers Products Corporation v. Boston Tow Boat Co., D.C.D.Mass. 1955, 134 F.Supp. 194, 200 (footnote 5); Lane v. Celanese Corp. of America, D.C.N.D.N.Y.1950, 94 F.Supp. 528, 530." Pennsylvania Ry. Co. v. The S.S. Beatrice, supra 161 F.Supp. at 149–50.

The pilotage clause indemnifies the towing company from liability when its tugmaster acts as pilot for any negligence of the pilot "in respect to the giving of any orders" to any assisting tugs and "in respect to the handling of [the] vessel."

The negligent act of the pilot here was primarily his having insufficient tug power available to assist in the docking. The terms of the pilotage clause do not seem to embrace this act of negligence. It is clearly not negligence arising from "the giving of orders to any of the tugs."

While the term "handling of [the] vessel" broadly construed might embrace the failure to have sufficient tug power, narrowly construed that term can mean no more than the directing of the movements of the vessel itself. California v. The Jules Fribourg, D.C.N.D.Cal.1956, 140 F.Supp. 333. See also Pennsylvania Ry. Co. v. The S.S. Beatrice, D.C.S.D. N.Y.1958, 161 F.Supp. 136, aff'd 2 Cir., 1960, 275 F.2d 209. Cf. National Distillers Prod. Corp. v. Boston Tow Boat Co., D.C.D.Mass.1955, 134 F.Supp. 194; Gypsum Queen-Tug Peerless, D.C.E.D. Va., 1953 A.M.C. 2071.

In the Fribourg case, supra, the captain of the tug which assisted the vessel also acted as pilot. He admitted that the ship's ramming of the pier resulted solely from the fact that he had underestimated the tide. He testified that had he accurately judged the strength of the tide, he would have conducted the docking operation in the same manner except that he would have ordered a second tug to assist in lifting the stern of the vessel up against the tide. This act, the court held, was not within the protection of the pilotage clause because it was not in the act of "giving orders to any assisting tugs" or "in respect to handling of such vessel." His sole act of negligence, the court stated, was his failure to order a second tug for use in case of need.

Accordingly, the negligence of the pilot Fitzgerald is not embraced within the terms of the pilotage clause and the respondent McAllister is liable for the negligence of its employee.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter of this suit and of the parties thereto.

2. The pilotage clause, as set forth in Finding No. 12, formed part of the contract between the parties.

3. There was no negligence on the part of either the tug Ellen F. McAllister or the vessel Hellenic Spirit.

4. The pilot Fitzgerald was negligent for failing to properly assess the capacity of the tug in the then-existing state of the tide.

5. Such negligence on the part of the pilot falls outside the scope of the pilotage clause under which liability of the respondent is precluded. The Pennsylvania Ry. Co. v. The S.S. Beatrice, D.C. S.D.N.Y.1958, 161 F.Supp. 136, aff'd 2 Cir., 1960, 275 F.2d 209; California v. The Jules Fribourg, D.C.N.D.Cal.1956, 140 F.Supp. 333.

6. The negligence of the pilot proximately caused the damage to the Hellenic Spirit.

7. The respondent McAllister is liable for the damages to the Hellenic Spirit resulting from the negligence of its employee Fitzgerald.

8. Libellant is entitled to an interlocutory decree sustaining its claim for liability against the tug McAllister in rem, and its owner McAllister Brothers, Inc. in personam.

9. The libellant is entitled to a provision in the interlocutory decree providing for the reference to a Commissioner of the damages to which it is entitled with costs and interest, if any, as determined by this court, upon entry of the final decree herein.

Submit interlocutory decree on notice in accordance with the foregoing.